**Patsy Kelly JARRETT,
Petitioner-Appellee,**

v.

**Frank R. HEADLEY, Superintendent of Bedford Hills Correctional Facility, Respondent-Appellant.**

**No. 1380, Docket 86–2121.**

United States Court of Appeals, Second Circuit.

Argued May 29, 1986.

Decided Sept. 25, 1986.

Claudia Angelos, New York City, for petitioner-appellee.

Monica R. Jacobson, Asst. Atty. Gen., New York City, (Robert Abrams, Atty. Gen., Gerald Ryan, Asst. Atty. Gen., New York City, on the brief), for respondent-appellant.

Before FEINBERG, Chief Judge, NEWMAN and KEARSE, Circuit Judges

KEARSE, Circuit Judge:

Respondent Frank R. Headley (hereinafter "the State"), Superintendent of the New York State correctional facility at which petitioner Patsy Kelly Jarrett is imprisoned, appeals from a judgment of the United States District Court for the Southern District of New York, David N. Edelstein, *Judge*, conditionally granting Jarrett's petition for a writ of habeas corpus on the ground that the identification of Jarrett at her state trial was unreliable and resulted from impermissibly suggestive police and prosecutorial procedures, in violation of her right to due process under the Fourteenth Amendment to the Constitution. *See* 633 F.Supp. 1403 (1986). The State contends principally that the police and prosecutorial procedures were not impermissibly suggestive and that, in any event, the identification of Jarrett was independently reliable. We conclude that the district court erred in finding that the in-court identification of Jarrett at trial was the result of impermissibly suggestive law enforcement procedures, and we therefore reverse.

## I. BACKGROUND

In the summer of 1973, Jarrett and her paramour Billy Kelly drove Jarrett's blue Oldsmobile from their hometown in North Carolina to Utica, New York, where the two lived together. They remained in Utica until about the middle of August, when they returned together to North Carolina. In 1977, in connection with events that had occurred in Utica in 1973 about two days before their departure, Jarrett, along with Kelly, was found guilty on two counts of murder, in violation of N.Y.Penal Law §§ 125.25(1) and (3) (McKinney 1975), and two counts of robbery, in violation of N.Y. Penal Law §§ 160.15(1) and (3) (McKinney 1975). Jarrett was sentenced to a prison term of 25 years to life.

### A. *The Events and Robert Hyland's Initial Statement*

In the early afternoon of August 11, 1973, a Seaway gas station near Utica was robbed and its attendant bound and slain. On August 13, 1973, Robert Hyland went to State Police Headquarters in Oneida, New York, and made a sworn statement to Investigator Ronald Hojnacki. As transcribed by Hojnacki and signed by Hyland, the statement described Hyland's observation of the events of August 11 as follows.

At approximately 12:50 p.m. on August 11, Hyland drove into the Seaway station and pulled up to the pumps. Shortly after he got out of his car to look for the attendant, a blue/green car backed around from the side of the station and parked opposite him near the pumps. Hyland described the car's driver as follows:

> I am not sure, but I believe the operator was a white female. She had long black shoulder length hair and was wearing dark clothing.... Upon moving closer to the gas pumps I observed this female going through items in a brown hexagon type pattern pocketbook.... The type of hairstyle that this person had did not allow me to see her face. The girl did have a tan.

A few seconds after the other car had parked, a white male, whom Hyland described in detail, approached Hyland's car, and sold him $5 worth of gas. Hyland paid for his gas, received change, and left the station. The man who sold Hyland gas was not the station's attendant.

## B. *Hyland's Pretrial Identifications of Jarrett*

More than two years later, police matched a latent fingerprint, lifted from the tape that had been used to bind the slain attendant, with that of Billy Kelly. In December 1975, New York State Police Investigator John Ingraham went to Hyland's home and showed him two groups of photographs. From the first array, of males, Hyland selected two pictures, both of Billy Kelly, as the man who sold him gas at the Seaway station on August 11, 1973.

Ingraham then gave Hyland a dozen photographs of females. Three bore the notation "New York State Police," one the notation "NY STA," and the one of Jarrett, "Sheriff's Department." The other seven bore no markings. Hyland initially selected two photographs, the one of Jarrett and one of the three photographs bearing a "New York State Police" legend, and eventually settled on the photograph of Jarrett as the driver of the other car at the Seaway station on August 11, 1973.

In March 1976, Hyland testified before the grand jury. He stated that the driver of the other car at the gas station "was combing her hair in the car" and "looked like a female." Shown the picture of Jarrett, Hyland testified:

A. Well, I can't say positive about this, about the way—it was the same style, long hair.

Q. Is it safe to say then that the best you can say is that it could be the girl but you can't say for sure?

A. Yes.

Following the grand jury's indictment, Jarrett moved to preclude the State from offering an in-court identification of her by Hyland at trial, on the ground that the identification procedures used by the police

had been unduly suggestive. In February 1977, a *Wade* hearing, *see United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), was held in State Supreme Court, at which Jarrett was present at the counsel table. Hyland testified that the other car at the gas station had been driven by a woman. He described the process of his selection of Jarrett's picture from among those shown him by Ingraham in December 1975, stating that he had initially selected two photos and then narrowed his choice to one. He testified that he had selected the one photo as "possibly being the female that was in the car at the gas station," but that he still thought that both of the photos he had initially selected looked like the driver.

He testified that Ingraham had given him the photographs in a pile and had not suggested which he should select or otherwise engaged him in conversation about the photos, even after he had made his selection. He said that he "may have" observed the "New York State Police" and "Sheriff's Department" markings on four photographs and that "I figured it was police pictures," but did not have the markings "in mind, at all.... I was more concerned with the picture."

On cross-examination, in response to Jarrett's counsel's inquiry as to whether he could describe the woman in the car, Hyland stated:

A. Yes. It was a question whether I was going to be served first with the gasoline or the girl. And this girl had long, darker hair, it seemed, than the one that's right there, now.

Q. Darker than the one right there, right now, you're referring to who?

A. That girl, right, there.

Q. At the Defense table?

A. Yes.

Following the *Wade* hearing, the state court denied Jarrett's motion to preclude Hyland's identification testimony, holding that the photographic identification procedures had not "create[d] a very substantial likelihood of irreparable misidentification":

[Hyland] observed ... Jarrett under favorable lighting conditions at close range, for a sufficient length of time and under such conditions as to make an impression upon him. The series of photographs of persons having approximately the same physical characteristics do not contain any element of suggestiveness, nor were any suggestive statements made to him by Investigator Ingraham. In response to a question as to certain photographs bearing police notations, the witness said he thought at the time that all the photographs were police shots.

The court also pointed out that Hyland "testified he could see [Jarrett] sitting in the car and that at the time her hair was darker than in the courtroom," and noted that in a companion hearing there had been evidence that Jarrett had worn her hair longer and dyed darker in August 1973 than it was in March 1976.

### C. *Hyland's Testimony at Trial*

Jarrett and Kelly were tried together on the murder and robbery charges. At trial, Hyland identified Jarrett as the other driver he had seen at the Seaway station.

When confronted on cross-examination with his initial statement that he had not seen the driver's face and was "not sure" even that the driver was a "female," Hyland's responses as to the gender of the driver grew far more certain than they had been prior to trial. Although perhaps occasionally displaying his earlier lack of certainty, he now stated that he was sure the driver was a female based on her "motion and everything"; that while her hair "was covering up a lot of her face," he could see her nose, eyes, and forehead; and that he "knew" on the day of his August 13, 1973 statement that the driver was a female. He maintained that the typed version of his initial statement was wrong and that he did not know how it had come to include the statement that he was "not sure." He said he did not read the statement but may have "scanned" it and have "thought it was probably right." On redirect examination by the district attorney and recross examination by counsel for Kelly, Hyland's testi-

mony on this issue included the following questions and answers:

Q. [By district attorney Wolff] ... Let me ask you this: When you were in the station, on August 11th, were you sure in your own mind that it was a girl that was in the car?

A. Yes. I would stake my life on that, that it was a girl.

. . . . .

Q. Is Patsy Jarrett the female you saw sitting in the car in front of the Seaway gas station on August 11, 1973?

A. Yes.

MR. WOLFF: Thank you.

RECROSS EXAMINATION BY MR. AUSTIN [counsel for Kelly]:

Q. That's your best judgment? Would you stake your life on that one, Mr. Hyland?

. . . . .

Q. You wouldn't want to stake your life on that, would you?

A. I put my trust in the Lord with it.

Q. How about your life?

A. Well, I have my life with the Lord.

Q. You wouldn't want that stake through your heart, would you?

A. (No response)

On cross-examination as to the circumstances surrounding his initial identification of Jarrett, Hyland testified that "at one time" he thought the driver might have been the girl in another photo and that he had "doubt" as to which photo was correct. However, he "thought" the girl in the photo he eventually settled on "was the one." He confirmed that both of the pictures he had initially selected looked like the Seaway driver. He testified that five of the photographs shown him bore police notations but that as to the other seven he "wouldn't say that [he] could tell" whether they were taken by a police agency. He testified that after he had made his final selection, Ingraham told him who the man and woman he had selected might be and where they were from.

Hyland was also asked whether he had received any briefing from the district attorney on the day he testified. His testimony was as follows:

Q. Did you talk to anyone as to how you were going to testify today?

A. I talked to the fellow, here. He told me to say what was in my mind.

. . . . .

Q. Did you discuss this case with the District Attorney, today, is that correct? You discussed this case a little bit today with Mr. Wolff, did you not?

A. Yes.

. . . . .

Q. Did he go over the testimony, at all, today with you? Did he tell you the kind of questions he was going to ask you?

A. He just told me to say what I thought on my mind and stick to my guns.

Q. Stick to your guns in response to his questions?

A. No. No.

Q. What guns have you got?

A. Well, that's an expression.

. . . . .

Q. ... Were you told to stick to your guns, in any event?

A. Well, to say what I believe, what was in my mind. I wouldn't say anything that wasn't in my mind.

Jarrett called Investigator Hojnacki to testify with respect to Hyland's 1973 written statement. Hojnacki had typed Hyland's statement bit by bit as Hyland gave it and testified that the contents of the typed statement were what Hyland had told him, that he had not added anything Hyland had not said, and that he would not have included a statement that Hyland did not see the face of the girl unless Hyland had said it. Hojnacki testified that he had instructed Hyland that only truthful and accurate information should be in the statement and that Hyland then read the statement before signing it.

Both the prosecution and the defense presented other evidence as to the gender and identity of the driver of the car Hyland had seen in the gas station. Three prosecution witnesses had seen a blue car at the station at the approximate time of the crimes. Two of the witnesses testified that a woman or girl had been at the station at that time, and one of them said the woman had emerged from the blue car. Jarrett testified that Kelly had often used her car without her and that she had told him he was free to date other women. One acquaintance of Kelly in Utica that summer testified that he had never seen Kelly with another woman. The testimony of other witnesses suggested that during that summer Kelly had frequented a homosexual bar and had liaisons with other young men; the defense also pointed out that in 1973 it was not uncommon for young men to wear their hair very long.

The jury, after deliberating over the course of two days, during which it requested a rereading of the testimony of both Hyland and Hojnacki, returned verdicts of guilty on all counts. On appeal to the Appellate Division, Jarrett's conviction was affirmed without opinion; leave to appeal to the New York Court of Appeals was denied.

### D. *The Present Proceeding*

Jarrett commenced the present habeas proceeding in 1984 pursuant to 28 U.S.C. § 2254 (1982), contending (1) that the admission of Hyland's identification testimony at trial had denied her due process, (2) that the evidence was insufficient to support her conviction, and (3) that the failure to sever her trial from Kelly's had denied her a fair trial. After the State objected that Jarrett had not exhausted her state remedies on the severance claim, Jarrett withdrew that claim.

Jarrett's petition was referred to United States Magistrate Michael H. Dolinger, who recommended that the writ be granted on the first ground but not on the second. He found that certain of the state court's findings, including the finding that Hyland

had believed that all of the photographs shown him were police photos, were not entitled to deference because the findings were "entirely unsupported by the record." *See* 633 F.Supp. at 1406, 1409, 1414 n. 21. The magistrate concluded that

a series of steps taken and not taken by the police from the time of the crime until Hyland took the witness stand were sufficiently suggestive in their cumulative impact to satisfy the first stage of the two-part analysis and thus to require the Court to review the independent basis, if any, for Hyland's in-court identification.

*Id.* at 1414. In particular, the magistrate found that "the manner in which [the array] was handled contributed significantly to the process of suggestion" in two respects: (1) the photo array in which Jarrett's picture was presented to Hyland had included only other women; and (2) four of these photographs had plainly visible law enforcement markings, with the marking "Sheriff" appearing only on Jarrett's photograph. *Id.* at 1415–16. He further found it particularly significant that Ingraham had, after Hyland's selection of Kelly's and Jarrett's photos, told Hyland who they might be and where they were from, since these disclosures "plainly would be expected to have a suggestive impact on an uncertain witness." *Id.* at 1416. The magistrate found that Hyland was also encouraged to view his selection of Jarrett's photograph as correct by the presence of Jarrett at the *Wade* hearing, the abundant pretrial publicity about the case, the absence of any lineup, and the prosecutor's telling Hyland just before he testified to "stick to [his] guns." The magistrate concluded that the "collective effect" of all the factors was sufficiently suggestive to require a review of the independent reliability of Hyland's identification. *Id.* at 1418. He found that reliability lacking.

The magistrate recommended that the petition's challenge to the sufficiency of the evidence be rejected, reasoning that if the identification by Hyland was admissible, the evidence was sufficient to support Jarrett's conviction.

The district court adopted the report of the magistrate and conditionally granted the petition, directing the State to release Jarrett unless she was retried within ninety days. The State appealed, and this Court granted a stay pending our decision of the appeal.

## II. DISCUSSION

On appeal, the State argues principally (1) that the district court erred in failing to give deference to the state court's findings of fact, (2) that the record shows that the pretrial identification procedures leading to Hyland's selection of Jarrett's photograph were not impermissibly suggestive, and (3) that events occurring after Hyland's selection of Jarrett's photograph were not grounds for excluding his in-court identification of her. Jarrett asks that the district court's ruling as to the identification procedures be upheld; she has not pursued her claim, rejected by the district court, that the evidence to convict her was insufficient. We find merit in the State's contentions and we reverse the judgment granting the writ.

### A. *General Standards*

The substantive and procedural framework within which we consider the issues on appeal is well established. The substantive principles govern the right of an accused to exclude from evidence an identification that has resulted from improperly suggestive law enforcement procedures, *e.g., Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), and the "right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain," *Solomon v. Smith,* 645 F.2d 1179, 1185 (2d Cir.1981). The procedural principles define the proper role of the federal habeas court in determining the facts to which the substantive principles are to be applied.

In general, a pretrial photographic identification procedure used by law enforcement officials violates due process if the

procedure "is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1969); *accord Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). When the number of photographs shown has not been so small as to make the presentation itself unfairly suggestive, *see United States v. Boston*, 508 F.2d 1171, 1177 (2d Cir.1974) (eight not impermissibly suggestive), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975); *see also United States v. Bennett*, 409 F.2d 888, 898 (2d Cir.) (six not impermissibly suggestive), *cert. denied*, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969), and there is nothing suggestive in the officials' manner of presentation, the principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to "suggest to an identifying witness that [that person] was more likely to be the culprit." *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir.1984). We have found, for example, that a photographic array was impermissibly suggestive when witnesses had described a bank robber as a light-skinned Black man with an Afro haircut, and of the six photographs presented, only that of defendant showed a Black having a light skin tone. *United States v. Fernandez*, 456 F.2d 638 (2d Cir.1972). And in addressing the similar question of the suggestiveness of a lineup, we have held that the presence of only the defendant wearing a shirt of the color described by witnesses was impermissibly suggestive. *United States ex rel. Cannon v. Montanye*, 486 F.2d 263 (2d Cir.1973), *cert. denied*, 416 U.S. 962, 94 S.Ct. 1982, 40 L.Ed.2d 313 (1974).

█ It is not required, however, that all of the photographs in the array be uniform with respect to a given characteristic. Thus, in *Archibald*, in connection with a conviction for a bank robbery that occurred in New York City's Borough of Manhattan, we rejected the argument that the six-photograph array was impermissibly sugges-

tive because only the defendant's photograph bore a legend indicating that he had been arrested in Manhattan, with the other photographs indicating that those persons had been arrested in other boroughs of the city. 734 F.2d at 940. Similarly, in *Fernandez*, we noted that if the impermissibly suggestive array that included the defendant had been combined with another five-photo array that included one other light-skinned Black with an Afro haircut, the resulting 11–man array that included two men fitting the witnesses' description would not have been improperly suggestive. 456 F.2d at 642. In *Cannon*, we noted that if "one or two" others in the five-person lineup had also worn a shirt of the color the attacker wore, "the inference [of undue suggestion] would weaken very considerably." 486 F.2d at 268.

When the witness's initial identification of the accused has been tentative and his later identifications are "positively certain," there may be a question as to whether the newfound certainty resulted from impermissibly suggestive law enforcement procedures. *Solomon v. Smith*, 645 F.2d at 1185. In *Solomon*, we concluded that the witness's certain in-court identification of the petitioner should have been excluded because her initially tentative identification was followed by, *inter alia*, repeated showings of the selected photograph in isolation, a courtroom showup, a lineup in which the witness identified someone else as the culprit, and eventually a highly suggestive lineup from which the witness selected the petitioner. We reached the same conclusion in *Dickerson v. Fogg*, 692 F.2d 238, 241–42, 244–45 (2d Cir.1982), where the initially tentative identification was transformed into a positive one by the combined effect of the police officer's conducting a showup, pressuring the witness into taking a second and third look at the suspect after his initial tentativeness, and then arresting the suspect in the witness's presence.

█ On the other hand, police suggestiveness does not require the suppression of an identification if the witness was not

thereby influenced, as, for example, when the witness's identification was already positive. *See United States v. Jarvis*, 560 F.2d 494, 499 & n. 8 (2d Cir.1977) (positive identification prior to confirmatory remarks and repeated showings), *cert. denied*, 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978); *United States v. Leonardi*, 623 F.2d 746, 755 (2d Cir.) (post-viewing confirmatory remark), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980); *see also United States v. Russell*, 532 F.2d 1063, 1067 (6th Cir.1976) (suggestive procedure not dispositive if it did not produce the alleged misidentification).

■■■ Where the pretrial identification procedures used with a given witness have been impermissibly suggestive, a later in-court identification by that witness will violate due process unless the in-court identification is shown to have reliability independent of those procedures. *See Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253; *Neil v. Biggers*, 409 U.S. at 199, 93 S.Ct. at 382; *Styers v. Smith*, 659 F.2d 293, 299 (2d Cir.1981). On the other hand, if the procedures were not impermissibly suggestive, independent reliability is not a constitutionally required condition of admissibility, *see United States v. Archibald*, 734 F.2d at 941; *United States v. Leonardi*, 623 F.2d at 755; *United States v. Bubar*, 567 F.2d 192, 199 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977), and the reliability of the identification is simply a question for the jury, *see Foster v. California*, 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127, 1128 n. 2, 22 L.Ed.2d 402 (1969).

■■■ In applying these substantive principles in the context of a habeas petition by a state prisoner pursuant to 28 U.S.C. § 2254, the federal court is restricted as to the amount of de novo factfinding it may conduct. Section 2254(d) provides, in essence, that where the petitioner has received a full and fair hearing adequately developing the material facts of his claim in a proper state court proceeding at which he has been accorded due process, and the

state court's resolution of the merits of the factual dispute is recorded in writing, the factual determination of the state court shall be presumed to be correct ...

(8) ... unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

28 U.S.C. § 2254(d). In the face of the required presumption, the burden is on the petitioner to show by convincing evidence that the factual determination by the state court was erroneous. *Id.; see Sumner v. Mata*, 455 U.S. 591, 592, 102 S.Ct. 1303, 1304, 71 L.Ed.2d 480 (1982); *Sumner v. Mata*, 449 U.S. 539, 550–51, 101 S.Ct. 764, 770–71, 66 L.Ed.2d 722 (1981).

The § 2254(d) presumption applies only to issues of historical fact, *see Sumner v. Mata*, 455 U.S. at 597–98, 102 S.Ct. at 1307, and to "factual inferences drawn from the historical facts," *Matusiak v. Kelly*, 786 F.2d 536, 543 (2d Cir.1986). The ultimate question of the constitutionality of pretrial identification procedures is a mixed question of fact and law, and hence is not governed by the presumption. *Sumner v. Mata*, 455 U.S. at 597, 102 S.Ct. at 1306.

[T]he federal court may give different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard. But the questions of fact that underlie this ultimate conclusion *are* governed by the statutory presumption....

*Id.* (emphasis in original).

With these principles in mind, we turn to the district court's determinations as to (1) the fairness of the photographic array presented to Hyland and (2) the suggestiveness of the other procedures that preceded Hyland's in-court identification of Jarrett.

## B. *The Character of the Photographic Array*

The district court found that the group of photographs that included Jarrett's photo was impermissibly suggestive because (1) it included only pictures of women, and (2) some of the pictures bore law enforcement notations, with only Jarrett's bearing the legend, "Sheriff's Department." These conclusions were erroneous.

 The argument that the array was impermissibly suggestive because it included no long-haired males should have been rejected on its merits. Although Hyland's initial written statement said *"I am not sure,* but I believe the operator [of the other car] was a white female" (emphasis added), the statement as a whole plainly confirmed that Hyland believed the operator was female. It proceeded to refer to this person as "the girl" four times, "she" or "her" three times, and "this female" once. The written statement does not reflect that Hyland ever referred to the other driver as a male, or used a male pronoun, or even used a he-or-she formulation.

Further, according to the trial testimony, other witnesses who observed the Seaway station at the pertinent time had stated that they had seen a woman there. Thus, the police had been given independent reason to infer that the person consistently referred to in Hyland's statement as a female was in fact a female. In all the circumstances, it was not impermissibly suggestive for the police to restrict its 12–photograph array to persons of that gender.

 As to the district court's conclusion that the array was impermissibly suggestive because Jarrett's photograph bore the legend "Sheriff's Department," we consider that conclusion doubly flawed. First, the court found that it was probable that Hyland would have ascribed undue significance to those photographs bearing a law enforcement legend, rejecting, as "entirely unsupported by the record," the state court finding that in fact Hyland had assumed that all the photographs shown him had

originated with the police. At the *Wade* hearing that preceded the state court's finding, Hyland was asked a series of questions relating to his understanding of the provenance of the 12 photos he had been shown. Having elicited the response that Hyland would have no way of knowing who had taken the photographs that bore no legend, Jarrett's counsel asked whether there was any doubt in Hyland's mind that at least four of the pictures had been taken by law enforcement agencies. The response and follow-up questions were as follows:

> A. I really did look at those. I didn't have that in mind at all.
>
> Q. You didn't look at that portion of the photographs?
>
> A. I was more concerned with the picture.
>
> Q. Are you telling us then that when you looked at these four photographs you did not see the police identification?
>
> A. *I figured it was police pictures.*
>
> Q. I didn't ask you that. I asked you whether or not did you observe the police identification on those photographs?

(Emphasis added.) The state court's finding that Hyland had assumed that all of the photographs were from law enforcement agencies was doubtless based on his statement that he had "figured it was police pictures" he was being shown. The "it" in this statement appears to have referred to the entire group of pictures, since the answer was, as counsel obviously recognized, not responsive to the question directed solely at the four photos bearing the legends. Thus read, Hyland's statement plainly provided support for the state court's finding, which was contradicted by the district court's finding that Hyland was probably unduly influenced by the four law enforcement legends.

 More importantly, even if Hyland had not assumed that all of the photographs had been taken by law enforcement agencies, the fact that several pictures displayed such an origin would not provide a basis for concluding that the array was impermissibly suggestive. As discussed

above, the array need not consist of photographs all of which display the culprit's described characteristics, and the presence of several similarly marked photographs in the array meant that no single one suggested itself in that respect as depicting the person suspected by law enforcement agents. Indeed, the propriety of this array in particular is underscored by the fact that there were two photographs initially selected by Hyland that he said looked like the person he had seen—Jarrett's and one of those marked "New York State Police"—and he had difficulty choosing between them.

Finally, we think little significance can be ascribed to the fact that of the several photos bearing law enforcement notations, only Jarrett's read "Sheriff's Department" while the others read "New York State Police." The likely significance of either legend to a witness is the fact that the person shown has had some problem with the law, not the identity of the agency that made the arrest. Hyland, for example, referred to all the pictures generally as "police" shots. And since Hyland was shown the photographs by a New York State Police investigator rather than a member of a sheriff's department, the sheriff's legend was likely to have little positive suggestive effect.

In sum, we conclude that the state court's findings of historical fact with regard to the procedures leading to Hyland's initial selection of the photograph of Jarrett as the driver he had seen in the Seaway station were entitled to deference, and that the district court's conclusion that those procedures were impermissibly suggestive did not conform to the proper legal standards.

We turn, therefore, to the question of whether Hyland's in-court identification of Jarrett should not have been permitted because the certainty of that identification was unfairly produced by the events that followed his selection of her photograph.

C. *The Subsequent Events*

The magistrate found that the events that followed Hyland's initial selection of

Jarrett's photograph contributed to the impermissible suggestiveness of the pretrial procedures, citing principally (1) Investigator Ingraham's postselection statement to Hyland as to who Jarrett and Kelly might be and where they were from, (2) the pretrial publicity given the case, (3) the failure of the state to conduct a lineup, and (4) the prosecutor's instruction to Hyland to "stick to [his] guns" at trial. Further, although concluding that the *Wade* hearing itself could not be considered unduly suggestive, the magistrate found it to be "surely one of the 'surrounding circumstances' that properly affect the court's evaluation of the appropriateness of what the police and prosecutors chose to do in obtaining the witness's in-court identification testimony." 633 F.Supp. at 1417. While the investigator's postidentification confirmatory information and the prosecutor's pretrial exhortation were plainly statements that should have been avoided, we cannot agree that in the circumstances of this case the postselection events, singly or in combination, required the suppression of Hyland's in-court identification.

1. *The Investigator's Postselection Statement*

■ The record is clear that until Hyland had settled on the photograph of Jarrett as that of the driver he had seen at the Seaway station, Ingraham did not make any statements about any of the persons whose pictures were in the array. After the selection had been made, however, Ingraham told Hyland "who they might be" and "where they were from." While this information, the details of which do not appear in the record, might well have been capable of confirming in Hyland's mind that his selection of the Jarrett photo was correct in the eyes of the police, especially given his certainty that Kelly was the man he had seen, the record reveals that Ingraham's statement simply did not have this effect. Thus, when next questioned three months later before the grand jury, Hyland remained equivocal as to his selection of

the photo of Jarrett: He testified that "the best" he could "say [was] that it could be the girl but [he] can't say for sure." Even at the 1977 *Wade* hearing a year later, he did not positively identify Jarrett: he stated merely that the driver he had seen at the Seaway station had had lighter and longer hair than the girl at the counsel table. He stated that he still thought both of the photographs he had initially selected looked like the person he had seen.

Thus, it cannot reasonably be inferred that Ingraham's December 1975 statement had the effect of turning Hyland's tentative identification into one that was certain.

### 2. *Jarrett's Presence at the Wade Hearing*

 Although the presence of a defendant at the counsel table during a proceeding at which a witness is expected to identify the defendant may, in certain circumstances, be tantamount to a showup, and the court has discretion to take steps to avoid any unfairness in the identification, *see, e.g., United States v. Archibald*, 734 F.2d at 941–43, there was no impropriety attributable to the prosecution in the present case because, as the district court found, Jarrett "did not request either not to be present or to be seated somewhere other than at counsel table." 633 F.Supp. at 1417. *See Boyd v. Henderson*, 555 F.2d 56, 61–62 (2d Cir.), *cert. denied*, 434 U.S. 927, 98 S.Ct. 410, 54 L.Ed.2d 286 (1977); *cf. United States v. Brown*, 699 F.2d 585, 594 (2d Cir.1983) (where defendant has prior notice of an in-court identification, no constitutional rights are violated if defendant did not request either prior line-up or that defendant be allowed to sit in audience with others of similar appearance). Jarrett's argument that her presence was induced by the prosecution because it had indicated that the identification of her by Hyland was only to be tentative is nonsensical. The district court properly found that Jarrett's presence at the *Wade* hearing was not the fault of the state. Since a defendant's voluntary acts cannot transform a permissible law enforcement proce-

dure into one that is constitutionally infirm, Jarrett's appearance at the hearing should not have been considered a circumstance contributing to the conclusion that Hyland's in-court identification should be suppressed.

### 3. *The Pretrial Publicity*

 We also reject the magistrate's view that pretrial publicity, although concededly not attributable to the law enforcement officials, had significance because it was "likely" to have made Hyland more sure of his identification of Jarrett. Preliminarily, we note that Jarrett's petition did not make any claim based on pretrial publicity. Further, had the petition contained such a claim, it would not have been properly before the district court because she had not asserted it in state court and hence had not exhausted her state court remedies as required by 28 U.S.C. § 2254(b). *See, e.g., Twitty v. Smith*, 614 F.2d 325, 331 (2d Cir.1979). Finally, the pretrial publicity relied on by Jarrett preceded even the *Wade* hearing. The magistrate noted that Hyland did not identify Jarrett at that hearing. Since his testimony at the first hearing following that publicity was about as equivocal as had been his initial selection of Jarrett's photograph, it was not reasonable to infer that that publicity made him more certain at a later stage.

### 4. *The Failure to Conduct a Lineup*

 The failure of the prosecution to hold a lineup was also not a factor that should have been considered in assessing the suggestiveness of the procedures that were used. We have previously held that if the procedures actually used were not impermissibly suggestive, "it is immaterial whether any other or different procedures could have been pursued." *Boyd v. Henderson*, 555 F.2d at 59.

### 5. *"Stick to Your Guns"*

 Finally, we turn to the fact that on the day Hyland testified, the prosecutor told him to "stick to [his] guns." There are

several problems with reliance on this statement as a basis for suppressing Hyland's identification.

First, while obviously it would be preferable for any prosecutor's preparation of his trial witnesses to be phrased in a way that does not appear to exalt steadfastness over accuracy, the statement here is not of a type we have found sufficiently suggestive to warrant suppression of an in-court identification. *See United States v. Danzey,* 594 F.2d 905, 910, 915–16 (2d Cir.) (though preferable for prosecutor, in second showing of photos, to ask witness to pick out the person she had seen rather than to "see if [she] could still pick out the same person as [she] picked out the last time," this phrasing was not impermissibly suggestive), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979).

Second, the stick-to-your-guns statement need not be interpreted as urging Hyland to adhere willy-nilly to his prior identification of Jarrett but could have been understood simply as urging him to adhere to what he believed was true and not to feel compelled to say anything he did not believe. Hyland in fact introduced the prosecutor's statement in just that way: "He just told me to say what I thought on my mind and stick to my guns."

Third, the problem in Hyland's trial testimony was not that he stuck to his prior statements but that he went beyond them to display certainty that the driver he had seen at the Seaway station was female and to deny that he had ever said he was uncertain. Hyland's emphatic certainty at trial in contrast to his prior consistent equivocation would not appear to have been induced by the prosecutor's statement. The urging to "stick to your guns" does not appear to implore the witness to invent new guns.

Fourth, it is highly doubtful that Hyland's increased certainty at trial played a significant role in the jury's deliberations, since his flamboyant statements of certainty were made only with respect to his belief that the driver was a girl, not that the girl was Jarrett. He reiterated the differences between Jarrett as she appeared at trial and the girl he had seen, confirmed that he had selected two photographs that looked like the girl he had seen, and refused to "stake [his] life" on the proposition that Jarrett was the girl he had seen. Given the many references in Hyland's written statement to the driver as a female and the testimony of other trial witnesses that they had seen a girl at the Seaway station at the pertinent time, it is difficult to conclude that Hyland's attempt to recant his initial expression of uncertainty over the driver's sex had any substantial impact on the jury. We note that the jury apparently took its responsibility as factfinder with appropriate seriousness, asking for a rereading of the testimony of both Hyland and Hojnacki, the latter having strongly endorsed the accuracy of Hyland's written statement.

Finally, we note that Hyland's identification of Jarrett at trial *preceded* his revelation on cross-examination of the prosecutor's stick-to-your-guns statement. Thus, that statement was not argued to the trial court in advance as a possible basis for preventing Hyland's in-court identification. Since the record does not indicate that after disclosure of the statement Jarrett's counsel made either a motion to strike Hyland's identification or a motion for a mistrial on this ground, there was no occasion for the trial court to exclude Hyland's testimony on this basis. We mention this not so much to suggest that there was a procedural default as to indicate that the prosecutor's statement was probably viewed as trivial.

We have reviewed all of the other grounds relied on for the proposition that the use of impermissibly suggestive procedures should have foreclosed Hyland's in-court identification of Jarrett and have concluded that none, singly or in combination, warranted such an exclusion. The district court concluded that the stick-to-your-guns statement "in itself would not justify setting aside the conviction." We agree and we reverse the granting of the writ.

## CONCLUSION

The judgment of the district court is reversed. The cause is remanded for the entry of judgment dismissing the petition.