Willie **BOLES**, Petitioner,

v.

Daniel **SENKOWSKI**, Superintendent, Respondent.

No. 94 Civ. 619 (CGC)(RWS).

United States District Court, N.D. New York.

March 13, 1995.

Willie Boles, pro se.

G. Oliver Koppell, Atty. Gen. for the State of New York, Judith I. Ratner, Asst. Atty. Gen., Albany, NY, for respondent.

## OPINION AND ORDER

KOELTL, District Judge *:

Willie Boles, who is currently incarcerated at Clinton Correctional Facility in Dannemora, New York, petitions pro se for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Boles was convicted in the Oneida County Court of robbery in the second degree on February 27, 1992. The court subsequently adjudicated Boles a persistent felony offender and sentenced him to an indeterminate sentence of twenty years to life imprisonment. On appeal, the Appellate Division affirmed his conviction. *People v. Boles,* 198 A.D.2d 837, 604 N.Y.S.2d 412 (4th Dep't 1993). The Court of Appeals denied Boles leave to appeal. *People v. Boles,* 83 N.Y.2d 802, 633 N.E.2d 493, 611 N.Y.S.2d 138 (1994).

Boles challenges his conviction on two grounds: first, he claims that there was insufficient evidence of physical injury, a necessary element of robbery in the second degree, for the jury to have found him guilty beyond a reasonable doubt; and second, he claims that two pretrial identification procedures were impermissibly suggestive in violation of due process and that, therefore, they should have been suppressed, along with the in-court identification.

## I.

On the night of November 21, 1990, Samuel Chandler left work a short time before seven o'clock p.m. (Trial Tr. at 29.) He had gotten paid that day and had cashed his paycheck; not having any pockets in his pants, he had put one hundred and seventy dollars inside his pack of cigarettes. (Trial Tr. at 30–31.) He stopped at a bar for some time and then proceeded to walk home at a little after nine or ten o'clock p.m. (Trial Tr. at 33–35, Hearing Tr. at 21–22.) Before arriving home, Chandler stopped to have a cigarette on the steps in front of the V.F.W. building. (Trial Tr. at 40.) While Chandler sat there, he was approached by a man who asked for a cigarette. (Trial Tr. at 42–44.) When Chandler offered the man the pack, the man grabbed the pack from Chandler. (Trial Tr. at 45.)

Intent on retrieving his money, Chandler lunged at the man, grabbing him by the front of his coat. (Trial Tr. at 46–47.) Up to that point, the two men had been together for three or four minutes. (Trial Tr. at 46.) The two men then struggled, punching and hitting each other for approximately five minutes, first standing up and then on the ground. (Trial Tr. at 48–49.) At some point during the struggle, Chandler felt a burning sensation; something had sliced through both shirts that he was wearing and cut through his skin on his left side, slightly above his belt line. (Trial Tr. at 50, 65–66.) Chandler then released his grip and the man who had taken his money ran away. (Trial Tr. at 50–51.)

Chandler walked across the street and found an older gentleman whom he asked to call the police. (Trial Tr. at 54.) A security guard arrived who, upon hearing what had happened, called the police with his walkie-talkie. (Trial Tr. at 54.) Chandler lay down, in pain, and awaited help. (Trial Tr. at 58.) The police arrived shortly thereafter, along with some paramedics who cleaned and bandaged Chandler's wound. While Chandler was being treated, he gave a description of

---

\* Pursuant to the authorization of Chief Judge Jon O. Newman of the Court of Appeals for the Second Circuit and by order of Chief Judge Thomas J. McAvoy of the Northern District of New York dated November 5, 1994, this case was transferred from the Northern District of New York to this Court for the purpose of disposing of the pending motion.

his assailant to Officer Dorozynski of the Utica Police Department. (Trial Tr. at 107–08.)

Upon learning that a suspect had been stopped on South Street, two police officers asked Chandler to go with them, in the police car, to see whether he could identify the suspect. (Hearing Tr. at 34.) Chandler agreed. When the car approached the corner of South and West streets where several police officers were standing with Boles, approximately ten minutes after the robbery had been reported, Chandler identified Boles as the man who had taken his money and with whom he had just struggled. (Trial Tr. at 60–61.) Chandler was then taken to police headquarters, where he was questioned. (Trial Tr. at 62–63.) While he was there, Chandler saw Boles. Chandler was not asked to identify Boles; rather, he was told to stand back six or seven feet to avoid a confrontation with Boles, who was escorted through the room that Chandler was in. (Hearing Tr. at 39, 50.) Subsequently, Chandler was taken to the hospital where he received a tetanus shot. (Trial Tr. at 63.)

## II.

■ Before obtaining relief under 28 U.S.C. § 2254, a petitioner must exhaust all available state remedies. 28 U.S.C. § 2254(b); see also Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971) ("[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied."); Blissett v. Lefevre, 924 F.2d 434, 438 (2d Cir.) ("A petitioner has given the state court ... [the fair] opportunity [to hear the claim] where he has presented, on direct appeal, the essential factual and legal allegations contained in his federal claim.") (citations omitted), cert. denied, 502 U.S. 852, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991). Here, the petitioner has exhausted his state court remedies because he presented both issues he now raises in his direct appeal from his conviction. The Appellate Division's affirmance of the conviction and the Court of Appeals' denial of leave to appeal satisfy the exhaustion requirement. See Williams v. Smith, 591 F.2d 169, 171 (2d Cir.), cert. denied, 442 U.S. 920, 99 S.Ct.

2845, 61 L.Ed.2d 289 (1979); Perro v. Reid, No. 87–1966, 1990 WL 27152, *1 (E.D.N.Y. March 7, 1990), aff'd, 923 F.2d 842 (2d Cir. 1990) (Table).

In addition, a petitioner must allege that he is in state custody in violation of the Constitution or a federal law or treaty as a prerequisite to relief under § 2254. 28 U.S.C. § 2254(a). Both of the petitioner's claims satisfy this requirement because they allege violations of the United States Constitution.

## III.

■ Under § 2254(d), a federal court in a habeas corpus proceeding must accord a "presumption of correctness" to "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction," unless the conditions for one of the seven listed exceptions are met or unless the state court findings are not "fairly supported" by the record as a whole. 28 U.S.C. § 2254(d); accord Ventura v. Meachum, 957 F.2d 1048, 1054 (2d Cir.1992).

■ Claims of insufficiency of the evidence upon which to base a conviction are cognizable claims of due process violations. Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). In Jackson, the Supreme Court held that in such a challenge to a state court conviction, pursuant to § 2254, the petitioner is entitled to habeas corpus relief if it is found that, based on the evidence adduced at trial, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. at 319, 99 S.Ct. at 2789; accord Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir.1994). The Court in Jackson explained that in reviewing the evidence, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326, 99 S.Ct. at 2793; accord Wheel, 34 F.3d at 66.

■ Boles claims that there was insufficient evidence of physical injury, a necessary

element of robbery in the second degree, for the jury to have found him guilty beyond a reasonable doubt.[1] The New York Penal Law defines "physical injury" as "impairment of physical condition or substantial pain." N.Y. Penal Law § 10.00(9) (McKinney 1987). While the New York state courts interpreting the Penal Law recognize that whether a victim has suffered physical injury generally is a question of fact for the jury, they also acknowledge that where the evidence fails to meet a certain threshold level (demonstrating, for example, only petty slaps, shoves and kicks), there is no physical injury as a matter of law. *See, e.g., In re Phillip A.*, 49 N.Y.2d 198, 200, 400 N.E.2d 358, 359, 424 N.Y.S.2d 418, 420 (1980) (evidence showing "nothing more" than that the complainant was hit causing him an unspecified degree of pain, causing him to cry and causing a red mark was consistent with "petty slaps" not intended to be covered by § 10.00(9) and was legally insufficient to establish "substantial pain").

The New York state courts interpreting the statute consistently have found that evidence demonstrating injuries analogous to Chandler's satisfies the definition of physical injury because it proves either substantial pain or impairment of physical condition. *See, e.g., People v. Tejeda*, 78 N.Y.2d 936, 937–38, 578 N.E.2d 431, 432, 573 N.Y.S.2d 633, 634 (1991) ("impairment of physical condition" does not require a victim's incapacitation; evidence of a wound that bled profusely and caused a scar that was visible at trial constituted sufficient evidence); *People v. Rivera*, 183 A.D.2d 792, 792, 583 N.Y.S.2d 520, 520 (2d Dep't) (noting that "[t]he scar alone is impairment sufficient to constitute physical injury[ ]"), *appeal denied*, 80 N.Y.2d 933, 603 N.E.2d 966, 589 N.Y.S.2d 861 (1992); *People v. Pagan*, 160 A.D.2d 284, 285, 553 N.Y.S.2d 380, 381 (1st Dep't) (sufficient evidence of physical injury where the victim's subjective experience of pain was corroborated by the police officer who took her complaint and was further substantiated by hospital records showing that she had x-rays

and a tetanus shot), *appeal denied*, 76 N.Y.2d 793, 559 N.E.2d 692, 559 N.Y.S.2d 998 (1990); *People v. Chesebro*, 94 A.D.2d 897, 897–98, 463 N.Y.S.2d 711, 712 (3d Dep't 1983) (issue of physical injury properly was submitted to the jury where the complainant testified that the defendant punched him "hard" causing numbness, bleeding, a cut and soreness for several days although he did not seek medical attention or miss work due to injury); *People v. Almonte*, 102 Misc.2d 950, 951–53, 424 N.Y.S.2d 868, 869–70 (Sup.Ct.N.Y.Co. 1980) (bleeding laceration requiring emergency outpatient treatment constitutes an impairment of ·physical condition even without testimony regarding any impairment in activity or function); *cf. People v. Carney*, 179 A.D.2d 818, 818, 579 N.Y.S.2d 157, 158 (2d Dep't) (insufficient evidence of physical injury where the complaining witness did not seek medical attention, did not testify about the nature or extent of her pain and did not testify about the extent to which any of her daily activities were curtailed), *appeal denied*, 80 N.Y.2d 894, 600 N.E.2d 652, 587 N.Y.S.2d 925 (1992); *People v. Oquendo*, 134 A.D.2d 203, 204, 521 N.Y.S.2d 5, 6 (1st Dep't 1987) (insufficient evidence of physical injury where the injury suffered "consisted entirely of pain experienced at the time of commission of the crime, the severity of which is undetermined, and some bruising, and there is no indication of any aftereffects[ ]"), *appeal denied*, 70 N.Y.2d 959, 520 N.E.2d 560, 525 N.Y.S.2d 842 (1988); *People v. Contreras*, 108 A.D.2d 627, 628, 485 N.Y.S.2d 261, 263 (1st Dep't 1985) (testimony about pain, "which is purely subjective and only one factor to be considered," was insufficient to establish physical injury).

Based on the evidence presented at trial, a rational jury could have determined that Chandler suffered physical injury. Chandler testified that during the struggle with the man who robbed him, he felt a burning sensation and that his wound "[b]urned, it hurt." (Trial Tr. at 59.) He testified that it was as if he had been "carving up meat" and cut

---

1. Section 160.10 of the New York Penal Law provides, in relevant part: "A person is guilty of robbery in the second degree when he forcibly steals property and when ... [i]n the course of the commission of the crime or of the immediate

flight therefrom, he or another participant in the crime ... [c]auses physical injury to any person who is not a participant in the crime...." N.Y. Penal Law § 160.10 (McKinney 1988). ·

himself. (Trial Tr. at 59.) The injury, while not requiring sutures or causing Chandler to miss work, did necessitate a tetanus shot, made Chandler unable to stand straight, caused Chandler pain for between two and three days for which he took Tylenol and resulted in a scar that was still visible at trial, nine months after the incident. (Trial Tr. at 63–65, 88–89.) Moreover, Officer Dorozynski testified that when he appeared on the scene, Chandler appeared to be in "a lot of pain." (Trial Tr. at 107.)

■ In reviewing the sufficiency of the evidence on a petition for habeas corpus, a federal court is not to decide "whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins,* —— U.S. ——, ——, 113 S.Ct. 853, 861, 122 L.Ed.2d 203 (1993). Because a jury rationally could have decided that Chandler suffered physical injury within the meaning of the statute, the petitioner's application for a writ of habeas corpus on this ground of insufficiency of the evidence on the issue of physical injury is denied.

### IV.

■ Boles also argues that two pretrial identification procedures used by the police officers were unduly suggestive and that those identifications, along with the in-court identification, should have been suppressed.[2] After a hearing on the issue, the state court judge denied the petitioner's motion to suppress the identification testimony and the testimony was admitted at trial.

Boles argues that the pretrial identification of him by Chandler at the corner of South and West streets should have been suppressed because the procedure used—a

showup[3]—was unduly suggestive. He further argues that Chandler's viewing of him at the police station, while not part of a formal identification procedure, was unduly suggestive and that it tainted his subsequent identification at trial.

■ The Supreme Court recognized that identification testimony could be challenged as violating a defendant's right to due process in *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). In *Stovall,* the Court explained that a court must determine, by considering "the totality of the circumstances," whether the confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identification" that the defendant was denied due process of law. *Id.* at 301–02, 87 S.Ct. at 1972. The Supreme Court has established a two-step inquiry to evaluate the permissibility of testimony pertaining to an out-of-court identification. The first part asks whether the circumstances surrounding the out-of-court identification procedure were unduly suggestive of the suspect's guilt. Admitting testimony of an out-of-court identification violates a defendant's right to due process where the identification procedure used was so impermissibly suggestive that it caused a very substantial likelihood of misidentification unless there is evidence of the independent reliability of the identification. *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972). In *Neil,* the Court explained that suggestive identification procedures increase the likelihood of misidentification and that "[i]t is the likelihood of misidentification which violates a defendant's right to due process...." *Neil,* 409 U.S. at 198, 93 S.Ct. at 381; *see also Stovall,* 388 U.S. at 297, 87 S.Ct. at 1970 ("A conviction

---

**2.** While 28 U.S.C. § 2254(d) provides a presumption of correctness for issues of historical fact where certain prerequisites are met, the ultimate question of the constitutionality of a pretrial identification procedure is a mixed question of law and fact, and hence is not governed by the presumption. *Sumner v. Mata (Sumner II),* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982); *accord Jarrett v. Headley,* 802 F.2d 34, 42 (2d Cir.1986). "[I]n deciding [the constitutionality of the pretrial identification procedures], the federal court may give different weight to the facts as found by the state court

and may reach a different conclusion in light of the legal standard." *Sumner II,* 455 U.S. at 597, 102 S.Ct. at 1306–07. The underlying factual questions (e.g., whether the witness had an opportunity to observe the crime or was too distracted), however, are subject to the § 2254(d) presumption. *Id.*

**3.** A showup is the presentation of a single suspect to an eyewitness for a possible identification. 1 Wayne R. LeFave & Jerold H. Israel, Criminal Procedure § 7.4(f) (1984).

which rests on a mistaken identification is a gross miscarriage of justice.").

The second part of the inquiry asks whether, despite an impermissibly suggestive identification procedure, the identification is sufficiently reliable to be admissible. *Neil*, 409 U.S. at 199, 93 S.Ct. at 382; *see also Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977) ("[R]eliability is the linchpin in determining the admissibility of identification testimony...."); *United States v. Wong*, 40 F.3d 1347, 1359 (2d Cir.1994) ("For both pretrial and in-court identifications, the linchpin of admissibility is reliability."). Sufficient reliability "purge[s] the taint of any improper suggestiveness." *Styers v. Smith*, 659 F.2d 293, 296 (2d Cir. 1981).

■■■ The factors relevant to reliability include: the opportunity of the witness to view the perpetrator at the time of the crime; the witness's degree of attention; the accuracy of the witness's prior description of the accused; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. *Neil*, 409 U.S. at 199–200, 93 S.Ct. at 382–383. These factors are considered in light of the totality of the circumstances. *United States v. Mohammed*, 27 F.3d 815, 821 (2d Cir.) (citation omitted), *cert. denied*, —— U.S. ——, 115 S.Ct. 451, 130 L.Ed.2d 360 (1994). They are weighed against the corrupting effect of the suggestive identification procedure. *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253. If there is a very substantial likelihood of misidentification, the witness's testimony pertaining to an out-of-court identification must be suppressed. *Neil*, 409 U.S. at 201, 93 S.Ct. at 383.

■■■ The test governing the admissibility of an in-court identification that follows, or is derived from, a pretrial identification is similar. Without proof of independent reliability, the in-court identification is not admissible where the pretrial identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968) (articulating the gov-

erning test in the context of an in-court identification of the defendant following an out-of-court identification by photograph); *see also Wong*, 40 F.3d at 1359 ("If pretrial procedures have been unduly suggestive, a court may nonetheless admit in-court identification testimony if the court determines it to be independently reliable.") (citations omitted). The two-step inquiry explained above in the context of the admissibility of pretrial identifications applies. *Dickerson v. Fogg*, 692 F.2d 238, 244 (2d Cir.1982).

■■■ The first out-of-court identification challenged, the identification of Boles at the corner of South and West Streets, by means of a showup procedure, was not impermissibly suggestive. Showups are permissible when they are conducted at or near the scene of a crime soon after the commission of the crime. In *People v. Riley*, 70 N.Y.2d 523, 517 N.E.2d 520, 522 N.Y.S.2d 842 (1987), the New York Court of Appeals explained:

> Showup identifications, by their nature suggestive, are strongly disfavored but are permissible if exigent circumstances require immediate identification or if the suspects are captured at or near the crime scene and can be viewed by the witness immediately. Generally, a showup identification will be inadmissible when 'there was no effort to make the least provision for a reliable identification and the combined result of the procedures employed' establish that the showup was unduly suggestive.

*Id.* at 529, 517 N.E.2d at 523, 522 N.Y.S.2d at 845 (citations omitted); *see also People v. Minter*, 186 A.D.2d 1035, 1035, 590 N.Y.S.2d 828, 828 (4th Dep't) ("Where ... the showup is made in proximity to the time and place where the crime occurred, it is an acceptable means of securing a suspect's identification.") (citations omitted), *appeal denied*, 81 N.Y.2d 764, 610 N.E.2d 400, 594 N.Y.S.2d 727 (1992); *cf. Styers*, 659 F.2d at 297 (notifying a witness that a suspect has been picked up, combined with the use of a stationhouse showup procedure, was impermissibly suggestive); *People v. Adams*, 53 N.Y.2d 241, 249, 423 N.E.2d 379, 382–83, 440 N.Y.S.2d 902, 905 (1981) (holding impermissibly sug-

gestive a stationhouse showup conducted several hours after the crime was committed where several witnesses simultaneously viewed the suspects in custody while they were physically restrained by police officers).

The Court of Appeals for the Second Circuit has affirmed that a showup shortly after a crime is not impermissibly suggestive because it is an important investigative procedure that assures that innocent persons are not arrested. In *United States v. Bautista,* 23 F.3d 726 (2d Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994), the court held that a confirmatory identification procedure was not unduly suggestive even though the defendant was presented to the confidential informant for identification at night while he was in custody and wearing handcuffs with a flashlight illuminating his face. *Id.* at 730. The court acknowledged the legitimate purpose and necessity of such a procedure. *Id.*

In this case, the initial showup was not impermissibly suggestive. About twenty minutes after the incident, having received medical assistance from paramedics on the street, Chandler was driven to the street where Boles was standing with some police officers. (Trial Tr. at 55–61.) Boles was not wearing handcuffs and he was wearing the same clothes that Chandler had seen him wearing during the confrontation. (Trial Tr. at 61.) Before the police asked him to, Chandler identified Boles. (Trial Tr. at 61.) As discussed above, this is precisely the sort of on-the-street identification procedure that has been approved as not impermissibly suggestive.

██ The second out-of-court identification challenged is Chandler's viewing of Boles at the stationhouse. The record indicates that the police conducted neither a line-up nor a showup at the police station; rather, there was a situation in which Chandler saw Boles while they both were at the stationhouse following Chandler's identification of Boles on the street. Chandler testified, at the suppression hearing, that while he was being questioned by the police at the station, the police officers asked him to stand back six or seven feet against a back or side wall in order to avoid a confrontation with Boles,

who then walked through the room. (Hearing Tr. at 38–39, 50.) Chandler was not asked to identify Boles. (Hearing Tr. at 50.) Therefore, cases pertaining to stationhouse showups are not controlling in this case. *See, e.g., Riley,* 70 N.Y.2d 523 at 531, 517 N.E.2d at 524, 522 N.Y.S.2d at 846.

██ Boles argues that this viewing of him by Chandler was unduly suggestive and that it tainted Chandler's later identification of him at trial. Under certain circumstances, the pretrial viewing of a defendant by an identification witness can render a subsequent in-court identification invalid. *See, e.g., Jackson v. Fogg,* 589 F.2d 108, 111 (2d Cir.1978) (in-court identification should have been suppressed where the police arranged to have the eyewitnesses on hand when the defendant was brought to the police station for a line-up and at least some of the identification witnesses had an opportunity to view the defendant at the station prior to the line-up). In this case, however, while it appears that the police officers could have undertaken greater efforts to ensure that Chandler did not encounter Boles at the police station, Chandler's viewing of Boles—whom he already had identified very shortly after the crime—was not impermissibly suggestive and it did not render the in-court identification of Boles invalid.

██ In any event, it is clear that, even if the pretrial identifications had been impermissibly suggestive—which they were not— the identification testimony was sufficiently reliable independent of any suggestive procedures. As the Court of Appeals for the Second Circuit explained in *Styers,* "Even grossly suggestive procedures will not require suppression of a witness' identification testimony if it is clearly reliable, independent of improper procedures." *Styers,* 659 F.2d at 297. Chandler's trial testimony, which was consistent with his earlier testimony at the suppression hearing, demonstrates overwhelmingly that each of the factors articulated in *Neil* weighs in favor of a finding that the identification testimony was reliable in this case.

First, Chandler had ample opportunity to view the perpetrator at the time of the crime.

He testified that there was adequate light—there were Christmas lights, illuminated signs and a street light nearby. (Trial Tr. at 46.) Before the perpetrator took Chandler's money and the struggle ensued, the two men stood together, face-to-face, for between three and four minutes, with no one else nearby. (Trial Tr. at 46.) Moreover, Chandler testified that during the approximately five-minute face-to-face struggle, which began when he grabbed his robber's jacket by the zipper and pulled the robber to him, the two men were "kissing close" and Chandler could, therefore, see the other man's face clearly. (Trial Tr. at 47–50.)

Second, Chandler's degree of attention was high. In fact, it appears that his attention was focused solely upon his attacker. Because he was so intent on getting his money back, Chandler lunged at the perpetrator and held onto his jacket tightly so that he would not escape. (Hearing Tr. at 29.) *See Wong,* 40 F.3d at 1360 (witness's observation of a gunman while the witness was ducking under a table, which consisted of her staring the gunman in the face for two or three seconds, was sufficiently reliable where the witness's degree of attention was "very high" as she stared at the assailant's face because she feared that he would shoot her and her husband).

Third, Chandler's very first description of the man who robbed him was accurate. Immediately after he was attacked and while he was being treated by the paramedics, Chandler described his attacker in detail. (Trial Tr. at 86.) While it is true that Chandler later provided a more detailed description, the latter description was not inconsistent with his initial description and Chandler's explanation for the disparity—that he was able to focus more on providing a detailed description after he calmed down and received treatment from the paramedics, (Trial Tr. at 86, 91–92),—is credible.

Fourth, Chandler demonstrated a high level of certainty with respect to the identity of his attacker, both on the street and at the stationhouse. Chandler testified at trial that as soon as he saw Boles on the street, he identified him, even without being asked to do so by the police. (Trial Tr. at 61.) More-over, Officer Deuel, who, along with Officer Fontaine, took Chandler to South and West Streets to see whether he could identify Boles, testified that when Chandler saw Boles, he was so excited that he kept trying to get out of the window of the police car and that the police officers had to restrain him. (Hearing Tr. at 114–15.) Similarly, while there was no actual identification procedure conducted at the stationhouse, Chandler recognized Boles as soon as Boles walked through the room. (Hearing Tr. at 58.)

Finally, the short length of time between the crime and the confrontations between Chandler and Boles weighs in favor of finding the identifications to be reliable. While it is not totally clear at precisely what time all of the events of the night transpired, all of the testimony at the suppression hearing and at trial establishes that the identification of Boles on the street took place between approximately twenty and thirty minutes after the incident. The viewing at the stationhouse appears to have occurred within several hours of the robbery. (Trial Tr. at 37–8.)

Because the identifications of Boles by Chandler were not the result of impermissibly suggestive police procedures and because all of the *Neil* factors weigh in favor of finding the identifications of Boles by Chandler reliable independent of any suggestive identification procedures, there has been no constitutional violation and Boles is not entitled to habeas corpus relief on this ground.

For all of the foregoing reasons, the petition for writ of habeas corpus is denied.

**SO ORDERED.**