**UNITED STATES of America,
Appellee,**

v.

**Jerrold Howard GOTTLIEB, Defendant-Appellant.**

**No. 531, Docket 73-2349.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 17, 1973.

Decided March 18, 1974.

John D. Gordan, III, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., for the Southern District of New York, and George E. Wilson, Asst. U. S. Atty., on the brief), for appellee.

Joan Goldberg, New York City (Rabinowitz, Boudin & Standard, New York City, on the brief), for defendant-appellant.

Before LUMBARD, FRIENDLY and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

Jerrold Gottlieb appeals from a judgment of conviction entered July 25, 1973 after a seven-day trial before Judge Griesa and a jury in the Southern District of New York. Gottlieb was convicted on all three counts of an indictment which charged him with making a false statement that he was a member of the United States Army National Guard, 18 U.S.C. §§ 1001, 2, with making a false certificate bearing upon his classification under the Military Selective Service Act, 50 U.S.C.App. § 462(a) and 18 U.S.C. § 2, and with conspiring with Harry Coogan, not named as a codefendant, to make fraudulent misrepresentations regarding his military status, 18 U.S.C. § 371. Gottlieb was sentenced to concurrent terms of two years imprisonment on each count with a fine of $5,000 on the conspiracy count and concurrent fines of $10,000 on the other two counts. Execution of the prison sentence was suspended and the defendant was placed on two years probation.

In arguing that his conviction should be reversed, Gottlieb maintains that certain highly prejudicial and irrelevant testimony was improperly admitted into evidence, that as a matter of law there was insufficient evidence to support his conviction, that the government failed to comply with the Jencks Act, 18 U.S.C. § 3500, thereby seriously weakening his defense, and that numerous instances of egregious prosecutorial misconduct occurred during the trial. Additionally, he asserts that the trial judge made several errors highly prejudicial to the defense, by unduly limiting the information the government was required to provide in its bill of particulars and in discovery, and in the instructions to the jury regarding the possible motives behind Coogan's testimony and the requisite degree of knowledge Gottlieb had to have to be found guilty. We affirm.

The undisputed evidence adduced at trial established that on August 27, 1964, the appellant, then attending Michigan State University, first registered for Selective Service with his local draft board in Mt. Vernon, New York. He was classified 2–S (deferment for undergraduates in college) and maintained this classification throughout his four years at Michigan State. The government presented evidence that in his fourth year, Gottlieb, aware that his 2–S status would terminate upon graduation in June 1968, sought to enlist in a National Guard unit. At the time, however, the Vietnam War was raging and waiting lists for the Guard were swollen. Thus, when Gottlieb applied on December 17, 1967, to the 242nd Signal Battalion headquartered in Hempstead, New York, his name was placed on a waiting list. The invariable practice was for Major Garofolo, who maintained the list, personally to speak with each applicant at the time he applied. Gottlieb did not deny that this had occurred in his case. The Major would inform the applicant of the expected waiting period and that the applicant would have to reapply every 30 days to preserve his position on the waiting list. If the applicant did not reapply, Major Garofolo would wait an

additional 30 days and then send an elimination letter by certified mail.

All applicants were also made aware that the enlistment process would involve several return visits to the armory. Among other things, the applicant was told that he would have to undergo a physical and mental examination and an interview with the unit commander prior to enlistment. Each applicant also had explained to him that, once enlisted, he would have a six-year commitment which would include a call to from five to nine months of active duty for basic training purposes within 120 days of enlistment as well as attendance at drills and summer camp.

Gottlieb admitted going to battalion headquarters in December 1967 and speaking with Major Garofolo. Although unable to recall the details of their meeting, he did not dispute the Major's account of the application procedure and practice. He did deny, however, receiving an elimination letter, even though the 242nd Battalion's enlistment register indicated that he had been eliminated in early March 1968 and it was Major Garofolo's practice to send such letters upon elimination of an applicant.

In June 1968, with Gottlieb's 2–S deferment coming to an end, his local board sent him a Current Information Questionnaire (SSS Form 127) preparatory to a review of his file at the board's July meeting. The form was returned by Gottlieb on July 1. He indicated on it that on June 16, 1968, two weeks before his deferment was to have expired, he had enlisted in Company C of the 242nd Signal Battalion of the New York National Guard. He gave his service number as NG 22039037 and on an attached note wrote that he would be coming to New York for all Guard meetings. The board also received a DD Form 44 (Record of Military Status of the Registrant). The form, dated June 25, 1968, certified that Gottlieb had, in fact, enlisted for six years and would be ordered to active duty for training within 90 days. The form was purportedly signed by the commanding officer of the unit, 2d Lieutenant Myron Wittlin, although it was later established at trial that Wittlin's signature had been forged. Upon receiving the response to the questionnaire and the DD Form 44, the local board reclassified the appellant 1–D (Member of Reserves) and informed him that he would remain so classified as long as he was a member of the unit. Gottlieb never again communicated with his local board.

Much of the testimony at trial focused on Gottlieb's alleged enlistment on June 16, 1968. It was undisputed that Dan Molinoff, Gottlieb's brother-in-law and son of Dr. David Molinoff, had brought the appellant to the Huntington Station Armory on Long Island to meet with Harry Coogan, a long time friend of Dr. Molinoff. Coogan was a full-time unit administrator in the New York National Guard. According to Coogan, who testified at trial for the government, Gottlieb explained to him that his deferment was running out and then asked if there was a slot for him in the Guard. Coogan responded that there was at least a year's wait, but that he could arrange to have appellant's classification changed by "a piece of paper to the draft board." In the presence of Gottlieb and Dan Molinoff, Coogan filled out a DD Form 44, obtaining the necessary information from Gottlieb's Selective Service card, and explained to the appellant that the form was just a means of changing his classification, that he was not actually in the National Guard, and that he would not have to report again. Indeed, the evidence at trial was undisputed that no personnel file was ever prepared for Gottlieb, that he never signed any papers, and that he was never given a drill schedule or a uniform. His service number was a complete fabrication.

The defense, however, contradicted Coogan's version of the June meeting. Gottlieb testified that Molinoff had contacted Coogan on his behalf to arrange to enlist. At the Huntington Station Armory, Coogan led them into an office where Gottlieb filled out an enlistment

form and was given an orientation statement. The appellant admitted supplying Coogan with certain information but denied that a DD Form 44 had been prepared in his presence or that he knew such a form would be sent to his local board. Gottlieb also admitted that he had not been sworn in, had not been advised of his service number, and had not been informed which unit he was in, although he testified this information was later relayed to him by Coogan so that he could fill out the Current Information Questionnaire from his local board. He conceded having expressed some uncertainty to Molinoff later in the day as to whether he was actually in the National Guard. Nevertheless, at trial, he maintained that when he filled out the Current Information Questionnaire and returned it on July 1 he believed he was in the Guard.

In the years following Gottlieb's purported enlistment in the 242nd Signal Battalion, he never was given a physical, attended a meeting, or received a communication from the unit. Despite this, at no time prior to 1971 did he address any inquiry to the unit, his local board, or other appropriate authorities. Gottlieb did testify that on several occasions he had his brother-in-law check with Coogan for him. This was not on a regular basis, however, and neither Coogan nor the unit were advised of his several changes of address while he was attending graduate school in the Washington, D. C. area.

Only in early 1971, after he became aware that Coogan was under investigation by the F.B.I., did Gottlieb, at the urging of his attorney, write two letters requesting a clarification of his draft status, to which he apparently received no response. He did not follow up on these letters. On April 13, 1971, Coogan was indicted by a federal grand jury in the Eastern District of New York on eight counts involving the furnishing of fraudulent certificates to the Selective Service System. He pled guilty to four counts and was sentenced June 13, 1973.

Over strenuous objection, the government attempted to show on Coogan's direct examination that these illegal activities engaged in by Coogan on behalf of those seeking to avoid the draft must have been known to Gottlieb and supported the government's assertion that he knew his own enlistment was fraudulent. Specifically, testimony was adduced that in 1963, Dan Molinoff, who had introduced the appellant to Coogan, had also arranged to have a long time friend of his meet with Coogan, who was then stationed at Lido Beach, New York. As testified to by Coogan, this meeting progressed in much the same manner as did the encounter with Gottlieb five years later. Molinoff's friend, Robert Cohen, was seeking to enlist in the National Guard since his 2–S deferment was about to expire. In the presence of Cohen and Molinoff, Coogan prepared a fraudulent DD Form 44, told Cohen it was a fraud and sent the form to his local board. Cohen furnished Coogan with the information necessary to complete the form and had no further contacts with him.

After Coogan's direct testimony regarding his dealings with Cohen, the defense requested the disclosure of F.B.I. interviews with Coogan regarding these activities. After some delay by the government, the relevant materials requested were finally produced.

I.

The most forceful argument by the appellant is that the trial judge should not have permitted the testimony by Coogan regarding the episode with Molinoff and Robert Cohen in 1963 on the ground that absent any showing of knowledge by Gottlieb, this testimony was irrelevant to the falsity of Gottlieb's alleged enlistment in 1968.

We agree that the trial judge should have sustained the defendant's objections to the admission of Coogan's testimony regarding Cohen on the ground that it was of questionable relevance, especially since the government could not

produce any evidence that Gottlieb knew about the Cohen incident. Nonetheless, after a review of the trial transcript, we conclude that the admission of this evidence was not reversible error.

"Ordinarily a ruling on the relevancy of evidence depends upon the exercise of the sound discretion of the trial judge and will not be disturbed upon appeal except for grave abuse." Hardy v. United States, 118 U.S.App.D.C. 253, 335 F. 2d 288 (1964). While Judge Griesa should have excluded testimony as to the dealings between Coogan, Cohen, and Molinoff in 1963, viewed in the light of all the evidence, we do not believe this testimony so prejudiced Gottlieb's defense as to require reversal. During the course of the trial, Coogan's testimony that Molinoff had accompanied Cohen to the 1963 meeting was severely discredited. F.B.I. interviews with Coogan introduced in evidence strongly suggested that Cohen had, in fact, gone unaccompanied to see Coogan. Other documentary evidence cast further doubt on Coogan's testimony. Thus, although he had asserted to the F.B.I. that Cohen's DD Form 44 had been prepared in September 1963, the form, in fact, was dated July 29, 1963. A letter sent by Cohen from Germany in July 1963 strongly suggested that he had been out of the country at the time the form had been prepared. These inconsistencies were all brought out in the course of cross-examination of Coogan, the last witness to take the stand before the jury retired to deliberate the verdict. Not only was this evidence, severely damaging to Coogan's credibility, the last the jury heard, but defense counsel further emphasized the weaknesses in Coogan's account of the alleged meeting with Cohen and Molinoff in her summation, also noting that the meeting should have no influence on the jury's determination regarding Gottlieb's knowledge in 1968. Under the circumstances, it is highly unlikely that the jury gave much, if any, credence to Coogan's account of the events of 1963. In any event, there was more than enough

other evidence pertaining to the events of 1967 to 1971 on which the jury would have had little difficulty in resting its verdict. Accordingly, the admission of testimony of the 1963 meeting, considered in the context of the entire trial, was not so prejudicial as to require reversal.

## II.

The appellant maintains, however, that the evidence presented at trial was insufficient for the jury to conclude that he was guilty. In support of his claim, he lays great emphasis on the rather fruitless efforts by the prosecution to establish Gottlieb's knowledge of what was happening from Dan Molinoff's alleged prior dealings with Coogan in 1963 on behalf of Robert Cohen. Since Coogan's testimony was severely undermined by inconsistencies and lapses in memory, Gottlieb asserts that it could not have been a sound basis for the jury's verdict. In addition, he points to several other weak spots in the government's case, such as the attempt to establish that only persons with a "signal" background were admitted into the 242nd Signal Battalion, when, in fact, this was not so.

There is no merit to this argument. As we have noted, more than enough evidence was presented at trial, apart from the 1963 Cohen matter, for the jury to find beyond a reasonable doubt that Gottlieb was guilty. The evidence disclosed that in December 1967, Gottlieb had gone to the Hempstead armory, had put his name on the waiting list and had been personally interviewed by Major Garofolo, who informed him not only that he would have to report for regular meetings, summer camp, and an immediate five to nine-month basic training course, were he admitted into the 242nd Battalion, but that he would have to undergo physical and mental examinations, speak with the commanding officer and return at least three or four more times before the enlistment process would be completed. Moreover, Major Garofolo was hardly sanguine about Gottlieb's

chances, making clear that there was more than a year's wait and that to remain on the waiting list the appellant would have to reapply every thirty days. Against this background and Gottlieb's subsequent failure to reapply after thirty days, there was a basis for the jury to credit the testimony of Coogan that at the meeting in June 1968, with Gottlieb's deferment on the verge of expiration, it was agreed that Coogan would submit a fraudulent DD Form 44 to the appellant's local draft board to prevent his conscription and that this procedure was fully explained to Gottlieb, who cooperated in the filing of this false statement and his own false claim that he was in a Guard unit.

Moreover, added support for this interpretation of the meeting in June could have been found by the jury in the subsequent behavior of Gottlieb. Although he received no communications from his unit at any time, was given no physical examination, received no uniform, and was not called for basic training, Gottlieb made no sustained attempt directly to contact the appropriate authorities to ascertain his status. Even after he knew that Coogan was being investigated for completing fraudulent forms and sending them to local boards, he made only the most perfunctory attempt to determine whether his own enlistment had been proper. When he received no response to two letters, he failed to pursue the matter further. In sum, there was overwhelming evidence of Gottlieb's guilt.

### III.

The appellant claims that his defense was severely prejudiced by the failure of the government to produce in a timely manner statements made by Coogan to the F.B.I. regarding his activities on behalf of Robert Cohen, in violation of 18 U.S.C. § 3500, the Jencks Act.

It is true that the government was tardy in making those materials available. Only after continued requests and demands by defense counsel were the materials provided and this at a time well into the trial. While not excusing this misconduct on the part of the government, we do not believe that the delay prejudiced the defense of the charges. The prosecutor's initial statements that no Jencks material existed were made in the good faith belief that this was in fact the case, based on responses to inquiries that had been made of other governmental bodies. Nor does it appear that there was a purposeful effort on the part of these other bodies to deny Gottlieb statements relevant to his defense. Rather, the delay in the production of these materials was a result of what Judge Griesa found to be "understandable confusion" arising from the material's being used in other investigations in the Eastern District of New York. Moreover, this initial confusion was soon overcome. The material sought was made available to the defense on Friday, May 18. On May 21, when trial resumed, however, appellant moved for a mistrial, asserting that Coogan's statements about Cohen had not been furnished until after Coogan had finished testifying. The prosecutor responded that Coogan would be available for cross-examination again, Coogan having already been cross-examined once, before the Jencks material was made available to the defense. But apparently in an effort to preserve Gottlieb's mistrial claim, his counsel indicated that the defense would not call Coogan. Instead the government called Coogan again and after direct examination, the defense did cross-examine him, and use was made of the materials it had acquired on May 18 to point out flaws in Coogan's testimony regarding his dealings with Robert Cohen and Dan Molinoff.

While the appellant now maintains that much of the impact that might have been made on the jury by confronting Coogan with these materials was lost because it did not come when he was originally on the stand, we do not agree. Here, the government's principal witness was severely discredited at the very conclusion of the trial. Under the circum-

stances, we can see no significant prejudice to the defense because of its inability to cross-examine Coogan regarding the Jencks material when he first testified.

Nor does our decision in United States v. Aaron, 457 F.2d 865 (2d Cir. 1972), support the appellant's claim. In that case, the United States Attorney knew of the existence and contents of an earlier report by the witness, an F.B.I. agent, to his agency even before the witness was called to the stand. The prosecutor allowed the defense counsel to begin his cross-examination of the witness without revealing the existence of this material. That such material existed was revealed eventually by the witness during his cross-examination and came as a complete surprise to defense counsel in front of the jury. Contrary to the thrust of defense counsel's cross-examination, this material established that the witness had previously made a report consistent with his direct testimony. In contrast, while Coogan's statements were made available later than they should have been, they were actually used quite effectively by the defense to discredit him.

### IV.

■■■ Gottlieb's other arguments may be disposed of summarily. His assertion that the court erred in refusing to order compliance with all of his very broad demands for discovery and a bill of particulars is without merit. The government was not required to disclose its evidence in advance of trial. United States v. Salazar, 485 F.2d 1272, 1277 (2d Cir. 1973); United States v. Crisona, 271 F.Supp. 150 (S.D.N.Y.1967), aff'd, 416 F.2d 107 (2d Cir. 1960), cert. denied, 397 U.S. 961, 90 S.Ct. 991, 25 L. Ed.2d 253 (1970). It was sufficient that Gottlieb was apprised that the theory of the government's case would be that he fraudulently misrepresented himself as a member of the National Guard to avoid being drafted and that this was done in conspiracy with Harry

Coogan. More than adequate discovery was allowed by Judge Griesa.

■■■ The appellant's claim that the prosecutor's remarks were so prejudicial as to deprive him of a fair trial is also without substance. The few comments by the prosecutor that portions of Gottlieb's testimony had been fabricated had ample support in the record and there is no basis to claim reversible error simply because the language was blunt and to the point.

■■■ Gottlieb further argues that the trial judge should have instructed the jury specifically about Coogan's possible motive to lie because of criminal charges then pending against him. In its opening, the government conceded that Coogan might have a motive to lie. His motive for testifying was alluded to during direct examination and focused on again during cross-examination by defense counsel. It was commented upon in the defense's summation. The trial judge, too, took note of Coogan's possible motive to falsify his testimony in his charge to the jury. Under the circumstances, the jury received adequate instruction regarding the possible motives Coogan might have had to testify falsely.

The appellant's final argument is that the trial judge improperly instructed the jury that they could convict Gottlieb if they found that he had knowingly stated falsely that he was a member of the National Guard or if "the defendant made the statement that he was in the National Guard when he didn't know whether or not he was in the Guard." We do not agree.

■■■■ Gottlieb does not seriously or convincingly dispute that a false statement regarding his membership in the Guard made with reckless disregard of its truth or falsity would support his conviction. But he claims that the instruction just quoted may have suggested to the jury that something less than reckless disregard would be adequate. Having reviewed in its entirety Judge Griesa's instructions concerning the

state of mind of the defendant necessary for the jury to find him guilty, we are fully satisfied that the jury understood that the defendant had to have acted either with actual knowledge, or, as the judge expressly stated in his instructions to the jury, had to have "wilfully blinded himself" to the truth or falsity of his claim that he was a member of the National Guard.

Affirmed.