UNITED STATES of America

v.

David MORGAN, Jason Morgan, John Brown, John Franklin, Courtney Branch, Ebrima Jobarteh, and Sheldon Morgan, Defendants.

No. 09 CR 699(SAS).

United States District Court, S.D. New York.

Feb. 11, 2010.

Jessica Massella and Parvin Moyne, Assistant United States Attorneys, New York, NY, for the Government.

Karl H. Buch, Esq., Chadbourne & Parke LLP, New York, NY, for Defendant David Morgan.

Mitchell Dinnerstein, Esq., New York, NY, for Defendant Jason Morgan.

Alan M. Nelson, Esq., Lake Success, NY, for Defendant John Franklin.

Lance Croffoot–Suede, Linklaters LLP, New York, NY, for Defendant Ebrima Jobarteh.

## OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge:

On July 16, 2009, defendants David Morgan a/k/a "Bigs," Jason Morgan a/k/a "Sina," John Brown a/k/a "Hollywood," John Franklin, Courtney Branch a/k/a "Snoop," Ebriema Jobarteh a/k/a "Boyz," and Sheldon Morgan were charged with conspiracy to distribute fifty grams and more of crack cocaine in violation of 21 U.S.C. § 846.[1] Defendants were previously arrested on June 17, 2009, on charges set forth in a Criminal Complaint sworn to on June 15, 2009, by Special Agent Rodrigo E. Riveros of the Federal Bureau of Investigation ("FBI"). Four of the seven defendants have filed the following pretrial motions:

1. Jason Morgan moves to suppress (1) evidence gathered pursuant to a search warrant executed at his residence at 1235 East 222nd Street, Bronx, New York; (2) a post-arrest statement;[2] and (3) an out-of-court identification of him made by an undercover officer using a "set book."

2. David Morgan moves to suppress an out-of-court identification of him made by an undercover officer using a "set book."

3. John Franklin moves (1) to suppress a post-arrest statement made by him;[3] (2) to suppress on out-of-court identification of him made by an undercover officer using a photographic ("photo") array; (3) for notice, at least two weeks prior to any scheduled trial, of any and all prior bad acts that the Government would seek to introduce against him pursuant to Federal Rule of Evidence 404(b);[4] (4) for a bill of particulars, and (5) for various other items of discovery.

4. Ebrima Jobarteh moves (1) to suppress a post-arrest statement made by him;[5] (2) for a bill of particulars, and (3) for various other items of discovery.

This Court held a suppression hearing on December 11, 2009, at which time the following witnesses testified: Detective Michael Carinha, New York City Police Department ("NYPD"), Bronx Narcotics Division; Special Agent Rodrigo Riveros, FBI; and Special Agent James Glynn, FBI. Although a majority of the hearing was devoted to the post-arrest statements of John Franklin and Ebrima Jobarteh, this Court heard oral argument regarding the identifications of David Morgan and Jason Morgan and the identification of

---

**1.** *See* Indictment 09 CR 699, Count One. Jason Morgan was also charged with unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). *See id.,* Count Two.

**2.** This motion was withdrawn by defense counsel on December 14, 2009, *see* Document # 63, given the Government's decision not to introduce at trial, in its case-in-chief, Jason Morgan's post-arrest statement concerning a firearm that was found in a suitcase at his apartment. *See* 12/9/09 Letter from AUSAs Parvin Moyne and Jessica Masella to the Court at 3.

**3.** This motion was denied by the Court at the conclusion of the suppression hearing held on

December 11, 2009. *See* 12/11/09 Suppression Hearing Transcript ("Tr.") at 213–14.

**4.** The Government has consented to this request which is now moot. *See* Memorandum of Law of the United States of America in Opposition to Defendants' Pretrial Motion ("Gov't Mem.") at 15 ("The Government consents to this request and will make its disclosure of 404(b) evidence with respect to all Defendants within at least two weeks of any scheduled trial date.").

**5.** This motion was denied by the Court at the conclusion of the suppression hearing held on December 11, 2009. *See* Tr. at 213–14.

John Franklin. For the following reasons, all outstanding pre-trial defense motions are hereby denied, except for the motions to suppress the pre-trial identifications of Jason Morgan and David Morgan.

## I. BACKGROUND

Defendants were the subjects of a joint investigation of the FBI and the NYPD, targeting drug trafficking activity in the area of East 166th Street and Teller Avenue in the Bronx, New York. From May 2008 to May 2009, several NYPD undercover officers working made approximately thirty-eight purchases of crack cocaine from various defendants in the area of East 166th Street and Teller Avenue. In particular, the purchases made by the undercover officers were executed inside Apartment #5 at 336 East 166th Street (the "Apartment"). The thirty-eight purchases totaled approximately forty grams of crack cocaine. In addition, the undercover officers also observed, on multiple occasions, sales of crack cocaine to other individuals inside the Apartment. At the time of Jason Morgan's arrest, a search warrant was executed for his residence at 1235 East 222nd Street, Apartment #2, Bronx, New York (the "Morgan Residence"). During this search, police officers found a handgun inside of a closed suitcase located in the Morgan Residence.

### A. Identification of John Franklin

On April 4, 2009, an undercover officer from the NYPD (the "UC") purchased crack cocaine from defendants Jason Morgan and John Franklin. In his undercover "buy" report, the UC described John Franklin as a male black, medium build, approximately 23–27 years old, 5'7"–5'309", 175–185 pounds, wearing black frame glasses, a black and white striped shirt, and blue jeans.

On April 4, 2009, the same day that the UC purchased crack cocaine from John Franklin, the UC was shown a photo array prepared by Detective Michael Carinha. The photo array consisted of photographs of six male blacks, all of whom were approximately the same age and none of whom were wearing glasses.[6] The UC identified John Franklin as "JD Stripes," the person from whom he purchased crack cocaine (picture #5).

Detective Carinha testified that he had prepared the photo array shown to the UC on April 4, 2009.[7] Detective Carinha decided to put John Franklin's photograph into the photo array based upon a description provided by the UC.[8] Detective Carinha obtained the photograph of John Franklin from the NYPD's photo management system.[9] The other five "filler" photographs were chosen at random, using an NYPD data bank that selects photographs of persons that look similar to the target photograph, based on the geographic area selected.[10] According to Detective Carinha, the UC had no role in preparing the photo array, nor did the UC ask for any specific photographs to be included in the photo array.[11] Furthermore, when the UC identified John Franklin as "JD Stripes," the UC indicated to Detective Carinha that he did not know John Franklin before he purchased crack cocaine from him on April

---

**6.** See Photographic Line–Up, Ex. A to the Gov't Mem.

**7.** See Tr. at 44.

**8.** See id. at 61–62.

**9.** See id. at 61.

**10.** See id. at 65. To complete the array, Detective Carinha entered "336 East 166" and then hit the "Pull Random" button. Id.

**11.** See id. at 45.

4, 2009.[12]

## B. Identification of Jason Morgan

On multiple occasions in the winter and spring of 2009, the UC purchased crack cocaine directly from Jason Morgan.[13] The date of the first purchase was January 14, 2009. Later that day, after the "buy" was executed, the UC recognized Jason Morgan from a "Set Book," which was previously reviewed by the UC as a customary part of the underlying investigation.[14] The "Set Book" in dispute was compiled by Detective Carinha. It is a three-ring binder filled with approximately sixty photographs of individuals targeted by the NYPD in an ongoing criminal investigation, *i.e.*, persons from the neighborhood under investigation that have a history of violence and/or narcotics distribution.[15] The Set Book has three dividers, including a divider for the "Teller Avenue Crew." [16]The Teller Avenue Crew section contains eleven photographs,[17] including the photograph of Jason Morgan (under the name "Edie Ray"), which is behind the photograph of David Morgan.[18]

## C. Identification of David Morgan

The identification of David Morgan parallels the identification of Jason Morgan— in the evening of January 14, 2009, the UC identified David Morgan from Detective Carinha's Set Book as "J.D. Bigs" who was subsequently identified as "Morgan, David." [19] As with Jason Morgan, the photograph of David Morgan contained in the Set Book is part of an NYPD "mugshot pedigree," which includes a printout of David Morgan's criminal history, including prior arrest and convictions. David Morgan's photograph is the first photograph contained in the Teller Avenue Crew section of the Set Book.[20] At the bottom of David Morgan's mugshot pedigree is the name "Bigga," in handwriting, next to the "Alias" category.[21]

## D. Search of the Morgan Residence

On June 16, 2009, a magistrate judge issued a search warrant for the Morgan Residence.[22] The Warrant Affidavit requests authorization to search the Morgan Residence for documents related to Jason Morgan's drug trafficking activities, in-

---

12. *See id.*

13. *See* Gov't Mem. at 21.

14. The UC identified "J.D. Sina" from Detective Carinha's Set Book. *See* Complaint Follow–Up Form (the "Buy Report"), Ex. E to the Memorandum of Law for Jason Morgan in Support of His Pretrial Motions ("Jason Morgan Mem."). The Form then identified "J.D. Sina" as "Moran, Jason" whose date of birth was 07–17–09. *See id.* Exhibit E does include the correct New York State Identification Number ("NYSID") number for Jason Morgan. *See* 12/4/09 Letter from Mitchell Dinnerstein, Esq. to the Court at 2. The Government argues that reference to "Jason Moran" in the UC's Buy Report was clearly a typographical error given the use of Jason Morgan's correct NYSID number, which is a "unique identifying number." Gov't Mem. at 23 n. 4.

15. *See* Tr. at 45.

16. *See id.*

17. *See id.*

18. *See* Jason Morgan Mem. at 3.

19. *See* Buy Report for "J.D.Bigs," Ex. 1 to the 12/1/09 Affirmation of J. Carson Pulley in Support of [David Morgan's] Motion to Suppress ("Pulley Aff.").

20. *See* Pulley Aff. ¶ 8.

21. *See id.* ¶ 9.

22. A copy of the Sealed Affidavit in Support of Application for a Search Warrant (the "Warrant Affidavit") is attached as Exhibit B to the Gov't Mem.

cluding drug ledgers, photographs, and address books, as well as electronic items such as cellular telephones and computers that could be used to store information related to drug trafficking activity.[23]

In support of the Government's request for a search warrant for the Morgan Residence, Special Agent Rodrigo Riveros set forth facts showing that Jason Morgan in fact lived at the Morgan Residence, including: (1) Jason Morgan had listed the Morgan Residence as his address with the New York State Department of Motor Vehicles; and (2) Morgan had two cars registered to the Morgan residence.[24] Special Agent Riveros also provided facts demonstrating that there was probable cause to believe that documents relating to the charged drug trafficking conspiracy would be found in the Morgan Residence, including: (1) Jason Morgan had participated in a conspiracy to distribute crack cocaine with defendants by selling crack cocaine directly to undercover officers on at least fifteen occasions during the course of that conspiracy; and (2) based on the agent's experience in numerous drug trafficking investigations, individuals who participate in drug trafficking often maintain in their homes, for long periods of time, books and records relating to their drug-trafficking activities.[25]

The search warrant was executed by law enforcement agents at the Morgan Residence on June 17, 2009, while Jason Morgan was being placed under arrest. During the execution of the search warrant, the agents found numerous documents, including bank statements in the name of Jason Morgan, a large amount of cash, and a loaded gun inside of a closed suitcase.

## II. LEGAL STANDARDS

### A. Pretrial Identifications

The Second Circuit has held that "[t]he linchpin of admissibility of identification testimony is reliability."[26] "The ultimate questions are whether the pretrial proceedings have been conducted in a manner that was unnecessarily suggestive and whether, in all the circumstances, there is 'a very substantial likelihood of irreparable misidentification.' "[27] When assessing challenges to identification procedures, courts generally must follow a two-step procedure.

When a witness has made a pretrial identification, the analysis of whether he is to be permitted to identify the defendant at trial normally requires a one-step or two-step inquiry. The first question is whether the pretrial identification procedures were unduly suggestive of the suspect's guilt. If they were not, the trial identification testimony is generally admissible without further inquiry into the reliability of the pretrial identification. In that circumstance, any question as to the reliability of the witness's identifications goes to the weight of the evidence, not its admissibility.[28]

---

**23.** See Ex. B at 9–11.

**24.** See id. at 5.

**25.** See id. at 6–8.

**26.** United States v. Maldonado–Rivera, 922 F.2d 934, 973 (2d Cir.1990).

**27.** Id. (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)).

**28.** Id. (citing Jarrett v. Headley, 802 F.2d 34, 40–41 (2d Cir.1986) ("In general, a pretrial photographic identification procedure used by law enforcement officials violates due process if the procedure 'is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' ") (quoting Simmons, 390 U.S. at 384, 88 S.Ct. 967)).

"If the pretrial procedures were unduly suggestive, the analysis requires a second step; the court must then weigh the suggestiveness of the pretrial process against factors suggesting that an in-court identification may be independently reliable rather than the product of the earlier suggestive procedures."[29]

 When evaluating a photo array, fairness depends on "the size of the array, the manner of presentation by the officers, and the array's contents."[30] Courts in this Circuit have held that a photo array containing six or more photographs is sufficiently large so as not to be unduly suggestive.[31] Improper suggestion, however, can result from either the composition of a photo array or from the manner in which law enforcement authorities conducted the identification procedure.[32] Thus, in determining whether a photo array is impermissibly suggestive, courts assess "whether the picture of the accused . . . so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit.'"[33]

 Accordingly, courts have found photo arrays to be unduly suggestive in circumstances where, for example, the defendant is the only one in the array with the skin color described by the witness,[34] or where the defendant is the only one with the specific hairstyle described by the witness.[35] However, "[t]he due process clause does not require law enforcement officers to scour about for a selection of photographs so similar in their subject matter and composition as to make subconscious influences on witnesses an objective impossibility."[36]

## B. Physical Evidence Obtained Pursuant to a Search Warrant

 Once a "neutral and detached magistrate" issues a search warrant upon a finding of probable cause, that finding is "entitled to substantial deference, and 'doubts should be resolved in favor of upholding the warrant.'"[37] Indeed, the mag-

**29.** *Id.* (citing, *inter alia, Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). "The factors to be considered are 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.'" *Id.* at 973–74 (quoting *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).

**30.** *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir.1992).

**31.** *See, e.g., United States v. Thai*, 29 F.3d 785, 808 (2d Cir.1994) (collecting cases).

**32.** *See, e.g., United States v. Padilla*, No. S194 CR 313, 1994 WL 681812, at *6 (S.D.N.Y. Dec. 5, 1994) ("[Defendant] claims that the composition of both his photo-array and his line-up were unduly suggestive. He also re- quests a hearing to determine whether the methods used by the police in conducting those procedures were unduly prejudicial.").

**33.** *Jarrett*, 802 F.2d at 41 (quoting *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir.1984) (alteration in original)).

**34.** *See United States v. Fernandez*, 456 F.2d 638, 641–43 (2d Cir.1972).

**35.** *See United States v. Eltayib*, 88 F.3d 157, 166–67 (2d Cir.1996).

**36.** *United States v. Bubar*, 567 F.2d 192, 199 (2d Cir.1977). Accord *Thai*, 29 F.3d at 808 (finding array was not improperly suggestive where it contained photographs of individuals all of the same sex, race, hair color, and approximate age as defendant, even though there were other minor differences).

**37.** *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir.1993) (quoting *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir.1983)).

istrate's "finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." [38]

▮▮▮▮ The duty of a court reviewing a magistrate judge's determination of probable cause is to ensure that the magistrate judge had a substantial basis for concluding that probable cause existed.[39] When considering whether to grant an application for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." [40] Similarly, a showing of a sufficient nexus between the alleged criminal activities and the premises to be searched "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." [41] Probable cause determinations must be approached in a practical way,[42] because "probable cause is a flexible, common-sense standard." [43] In sum, the evidence presented to a magistrate judge " 'must be

seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " [44]

## C. Bill of Particulars

▮▮▮▮ It is well established that the proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense.[45] "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." [46]

▮▮▮▮ If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," such as discovery or a criminal Complaint, no bill of particulars is required.[47] In other words, the defense cannot use a bill of particulars as a general investigative tool,[48] or as a device to compel disclosure of the Government's evidence prior to trial.[49] "The Government is not required to

---

**38.** *Travisano,* 724 F.2d at 345.

**39.** *See Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**40.** *Id.* at 238, 103 S.Ct. 2317.

**41.** *United States v. Singh,* 390 F.3d 168, 182 (2d Cir.2004) (quotation marks and citations omitted).

**42.** *See Gates,* 462 U.S. at 232, 103 S.Ct. 2317.

**43.** *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

**44.** *Gates,* 462 U.S. at 231–32, 103 S.Ct. 2317 (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). *Accord United States v. Shipp,* 578 F.Supp. 980, 985 (S.D.N.Y.1984) ("The standard in reviewing a previous determination of probable cause for the issuance of a search warrant by a judicial officer is 'only a probability and

not a prima facie showing of criminal activity.' ") (quoting *United States v. Travisano,* 724 F.2d 341, 345–46 (2d Cir.1983)).

**45.** *See* Fed.R.Crim.P. 7(f); *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990); *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987).

**46.** *Torres,* 901 F.2d at 234 (quotation marks and citation omitted).

**47.** *Bortnovsky,* 820 F.2d at 574; *United States v. Morales,* 280 F.Supp.2d 262, 274 (S.D.N.Y. 2003).

**48.** *See United States v. Salazar,* 485 F.2d 1272, 1277–78 (2d Cir.1973).

**49.** *See United States v. Triana–Mateus,* No. 98 CR 958, 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing *United States v. Gottlieb,* 493 F.2d 987, 994 (2d Cir.1974)).

disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed, [therefore] 'the Government is not required to provide information that would, in effect, give the defendant a preview of the Government's case before trial.'" [50]

■ Under the relevant legal standard, the Government is not required to (a) "particularize all of its evidence;" [51] (b) disclose the precise manner in which the crimes charged in the indictment were committed; [52] or (c) provide the defendant with a preview of the Government's case or legal theory. [53] The ultimate test is whether the information sought is necessary, not whether it is helpful. [54]

### D. *Brady* Material

■ Pursuant to the Due Process Clause of the United States Constitution, the Government has a duty to disclose favorable evidence to the accused where such evidence is "material" either to the accused's guilt or punishment. [55] Favorable evidence includes evidence that tends to exculpate the accused, as well as evidence that is useful to impeach the credibility of a government witness. [56] As the Court of Appeals has explained, *Brady* and *Giglio* material must be provided by the Government "in time for its effective use at trial." [57]

### E. *Giglio* and Jencks Act Materials
### 1. Government Witnesses

■ The Government is under no obligation under the Jencks Act [58] to produce prior statements of its witnesses until after each has testified on direct examination. The Jencks Act provides in pertinent part:

In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subp[o]ena, discovery, or inspection until said witness has testified on direct examination in the trial of the case. [59]

Courts in this Circuit have consistently held that district courts lack the power to mandate early production of Jencks Act material. [60] Similarly, courts in this Circuit

**50.** *Id.* (quoting *United States v. Conley*, No. 00 CR 816, 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002)).

**51.** *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir.1991).

**52.** *See Torres*, 901 F.2d at 233–34 (stating that demands for "whens" and "wheres" and "by whoms" within charged conspiracy are improper attempts at general pretrial discovery).

**53.** *See United States v. Muyet*, 945 F.Supp. 586, 598–99 (S.D.N.Y.1996).

**54.** *See United States v. Trippe*, 171 F.Supp.2d 230, 240 (S.D.N.Y.2001); *Conley*, 2002 WL 252766, at *4.

**55.** *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**56.** *See Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

**57.** *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir.2001). *Accord id.* at 142 ("[T]he prosecutor must disclose ... exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made").

**58.** 18 U.S.C. § 3500 et seq.

**59.** 18 U.S.C. § 3500.

**60.** *See, e.g., In re United States*, 834 F.2d 283, 287 (2d Cir.1987); *United States ex rel. Lucas v. Regan*, 503 F.2d 1, 3 n. 1 (2d Cir.1974); *United States v. Ortiz–Montoya*, No. 93 CR 50, 1995 WL 37841, at *1 (S.D.N.Y. Jan. 31, 1995); *United States v. McGuinness*, 764 F.Supp. 888, 896 (S.D.N.Y.1991).

have repeatedly refused to compel disclosure of impeachment or *Giglio* material well in advance of trial. In *United States v. Coppa,* the Second Circuit held that the Government is not required to produce *Giglio* material until it produces "3500 material" pursuant to the Jencks Act, so long as the Government provides the *Giglio* material in time for its effective use at trial.[61]

### 2. Non–Government Witnesses

■ The Government is not required to provide to a defendant *Giglio* or Jencks Act material if a witness does not testify at trial.[62]

## III. DISCUSSION

### A. Jason Morgan's Motion to Suppress Physical Evidence Obtained Pursuant to Search Warrant

■ Jason Morgan challenges the issuance and execution of a search warrant for his residence. This challenge is wholly without merit. Specifically, Morgan argues that there was no probable cause for the issuance of a search warrant for the Morgan Residence because the Warrant Affidavit filed in support of the warrant did not contain evidence of any criminal activity at that location, as opposed to the Apartment located at 336 East 166th Street, from which Jason Morgan and the other defendants were selling crack cocaine. Because the search warrant for the Morgan Residence was issued after a review by a magistrate judge, and because the Warrant Affidavit sets forth probable cause to believe that the items listed in the warrant, including documents and records related to Jason Morgan's drug trafficking activity, could be found in the Morgan Residence, his challenge to the warrant is denied.

■ Jason Morgan asserts that the Warrant Affidavit did not justify a search of his residence because (1) there were no allegations that any criminal activity occurred in the Morgan Residence; (2) the weapon seized from the Morgan Residence was unrelated to the drug conspiracy; and (3) any probable cause to show that Morgan had participated in the drug conspiracy was stale. But these assertions fail to take into account the Affiant's opinion that the Morgan Residence would likely contain evidence of criminal activity. The Morgan Residence was searched only after the issuance of a search warrant by a magistrate judge. Moreover, the warrant was properly authorized after the magistrate judge's review of adequate facts setting forth probable cause. As set forth above, once a "neutral and detached magistrate" issues a search warrant upon a finding of probable cause, that finding is "entitled to

---

**61.** 267 F.3d at 145–46. *Accord United States v. Nixon,* 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *United States v. Greyling,* No. 00 CR 631, 2002 WL 424655, at *2 (S.D.N.Y. Mar. 18, 2002) (production of *Giglio* material by the Wednesday before the week in which a witness will testify is appropriate); *United States v. Gallo,* No. 98 CR 338, 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendants' motions to require the early production of *Giglio* and 3500 material based on Government's representations that it would provide the information sufficiently in advance of each witness's testimony to allow adequate time to prepare for cross-examination); *United States v. Mejia,* No. 98 CR 4, 1998 WL 456257, at *1 (S.D.N.Y. Aug. 5, 1998) (denying defendant's motion to compel all impeachment material under *Giglio* based on the Government's representations that it would make such information available at the time that it provides 3500 material).

**62.** *See Jimenez–Garcia v. United States,* No. 97 Civ. 2911, 1998 WL 132788, at *3 (S.D.N.Y. Mar. 24, 1998) (holding that material for witnesses need not be produced to defendant where the witnesses "were not called as government witnesses at trial").

substantial deference, and doubts should be resolved in favor of upholding the warrant." [63]

■■■■■ First, the Warrant Affidavit recited sufficient facts tying the Morgan Residence to Jason Morgan including his registration of numerous cars at that address and his listing of that address with the New York State Department of Motor Vehicles. The testifying agent also set forth his opinion, based upon his experience in numerous drug trafficking investigations, that drug traffickers often keep records, ledgers, address books, photographs, and other documents related to their drug trafficking in their homes. As the Second Circuit has recognized, a Government agent's expert opinion "is an important factor to be considered by the judge when making a probable cause determination." [64] This Court is entitled to rely on the agent's opinion, as well as the commonsense notion that an individual engaged in a conspiracy may have evidence of that conspiracy, including telephone numbers and other contact information, located in his residence.[65] Thus, the argument that the Morgan Residence was not linked to specific criminal activity is irrelevant.

Morgan's staleness argument also fails. First, the Warrant Affidavit states that there is probable cause to believe that Morgan was involved in a drug trafficking conspiracy that operated from May 2008 up to and including May 2009, and that, on at least fifteen separate occasions during that time, Jason Morgan was directly involved in selling crack cocaine to undercover officers. In addition, the testifying agent opined that drug dealers often maintain documents in their residences for long periods of time. Thus, because Morgan was involved in an ongoing drug trafficking conspiracy and because the Warrant Affidavit articulated the agent's basis for his belief that documents and records related to the drug conspiracy would be maintained over time in the Morgan Residence, Jason Morgan's staleness argument is without merit.

■■■■■ Jason Morgan's next argument—that the loaded firearm found in a suitcase belonging to him inside the Morgan Residence should be suppressed because it does not relate to the charges in this case—also fails. Once the agents were properly searching the Morgan Residence pursuant to a search warrant for documents and other items related to the drug trafficking conspiracy, they were entitled to search any place, including the suitcase, where those items could be found. Obviously, once they saw other contraband here, a loaded firearm, in the possession of Jason Morgan, a felon who cannot legally own a gun—they were entitled to seize it.[66]

## B. Jason Morgan's and David Morgan's Motion to Suppress Their Identifications Using the Set Book

Jason Morgan and David Morgan move to suppress the UC's post-sale identifica-

---

63. *Rosa,* 11 F.3d at 315 (quotation marks and citation omitted).

64. *United States v. Benevento,* 836 F.2d 60, 71 (2d Cir.1987) (quotation marks and citation omitted).

65. *See United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985) (approving district court's reliance on agent's expert opinion that narcotics traffickers "frequently maintain at their homes large amounts of cash, drugs, books, ledgers and other documents evidencing their criminal activities").

66. Under the "good faith" exception, evidence seized pursuant to a search warrant for which there was no probable cause is still admissible so long as the investigating officers executed the warrant in "objective good faith." *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

tions of them using the Set Book. Both Morgans argue that the evidence produced at the suppression hearing confirmed that the identifications were unduly suggestive and unreliable such that they should be suppressed and the UC should not be permitted to make any in-court identifications.

### 1. The Record Facts Establish Undue Suggestiveness

██ A typical photo array has six or more photos of persons with similar features and appearances as the "target" of the identification. It is not accompanied by descriptions, names, or other identifying writing of any kind. At the suppression hearing, Detective Carinha acknowledged that photo arrays of this nature are necessary to prevent unduly suggestive identifications.[67]

Here, the evidence showed that the Set Book had virtually none of the safeguards typically present in a valid photo array. The very purpose of the Set Book—which was compiled by Detective Carinha to collect information regarding subjects of criminal investigation and use it to inform police officers about alleged criminals operating in the area—makes the suggestiveness of the Set Book unavoidable and indisputable. Among the eleven mugshot pedigrees contained in the "Teller Avenue Crew" section of the Set Book, there were no random fillers or look-alike photographs. Every single photograph was a

subject of interest of an ongoing criminal investigation. This meant that the UC was guaranteed to select a person suspected of criminal activity when he identified anyone within the Teller Avenue Crew section of the Set Book. To make matters worse, the Set Book did not just contain the photos of the Teller Avenue Crew, it also included information regarding their criminal history. This went beyond a mere suggestion that Jason Morgan or David Morgan were "more likely to be the culprit."[68] The Set Book in effect stated, as a matter of fact, that both Morgans were suspected of criminal activity with regard to the Teller Avenue Crew. Both Morgans have therefore sufficiently established the undue suggestiveness inherent in the use of the Set Book.

### 2. There Are Independent Bases for the UC to Make a Reliable In–Court Identification of Jason Morgan

██ Despite the undue suggestiveness of the Set Book as a method of identification, there are alternative independent bases by which the UC could make a reliable in-court identification of Jason Morgan. *First,* the UC engaged in multiple "buy" transactions with Jason Morgan over an extended period of time.[69] *Second,* on April 16, 2009, two days after another "buy" transaction between the UC and Jason Morgan, the UC spotted Jason Morgan on the street in the vicinity of 166th Street and Teller Avenue.[70] The UC

---

67. *See* Tr. at 68.

68. *Concepcion,* 983 F.2d at 377.

69. *See* Criminal Complaint ¶ 12 (describing transactions that took place on January 14, 2009, and February 5, 2009, where the UC purchased crack cocaine directly from Jason Morgan). In all likelihood, there were many other direct transactions between the UC and Jason Morgan given that Jason Morgan engaged in approximately fifteen separate trans-

actions with undercover officers from the NYPD. *See* Warrant Affidavit ¶ 7 ("JASON MORGAN, a/k/a 'Sina,' engaged in sales of 'crack' cocaine to UCs on at least approximately 15 separate occasions during the course of the charged conspiracy, including the specific examples set forth in paragraph 12 of the Complaint.").

70. *See* Gov't Mem. at 22.

then identified Jason Morgan as the person he knew as "Sina" to several nearby police officers.[71] The officers stopped Jason Morgan on the street, requested, and then obtained, his identification.[72]

Given these repeat exposures between the UC and Jason Morgan, there is virtually no chance that the use of the Set Book was so suggestive as to prevent the UC from making a reliable in-court identification. As stated by the Supreme Court, "the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."[73] Here, the witness is not merely a layperson but rather a law enforcement officer, professionally trained to observe and recall accurately. If this case proceeds to trial, the UC will be permitted to make an in-court identification of Jason Morgan without a preliminary hearing.[74] However, the UC's pre-trial identification of Jason Morgan using the Set Book is hereby suppressed.

**3. The Government Has Not Yet Established an Independently Reliable Basis to Allow the UC to Make an In–Court Identification of David Morgan**

The evidence has plainly established that the Set Book was inherently prejudicial for the reasons set forth above. Accordingly, for the reasons stated above with regard to Jason Morgan, the UC's pre-trial identification of David Morgan using the Set Book is also suppressed. Furthermore, to date, the Government has not established an independently reliable basis to permit an in-court identification of David Morgan by the UC. Accordingly, if the case proceeds to trial, I will hold a brief evidentiary hearing immediately before the UC testifies at which defense counsel will be permitted to question the UC to determine whether he has an independent basis for an in-court identification of David Morgan. I will then determine whether there is such a basis and either permit or preclude the UC from so testifying.

**C. John Franklin's Motion to Suppress His Identification Using the Photo Array**

█ John Franklin does not challenge the composition of the photo array except to note that none of the individuals in the array were wearing glasses.[75] Rather, he

---

**71.** *See id.*

**72.** *See id.*

**73.** *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

**74.** Jason Morgan's request for a hearing to determine whether the Set Book identification procedure was so suggestive as to prevent the UC from making a reliable in-court identification is therefore denied.

**75.** Franklin makes much of the fact that the UC's Buy Report noted that the seller was wearing large rimmed, black glasses and that no one in the photo array was wearing glasses. This is, in the words of Shakespeare, much ado about nothing. If Franklin were the only individual in the photo array wearing glasses, the photo array would undoubtedly have been unduly suggestive. But the fact that none of the persons included in the array was wearing glasses, including Franklin, neutralizes any argument that the absence of glasses was somehow prejudicial to Franklin. Certainly, an NYPD undercover officer should be able to identify an individual who typically wears glasses by looking at a photograph of that individual not wearing glasses. Glasses do not change a person's facial structure, their skin tone, build, or facial features. I therefore find no merit in Franklin's belabored argument regarding the absence of glasses in the photo array.

seeks to explore the circumstances of the identification procedure.[76] Specifically, Franklin seeks to learn why Detective Carinha included a photograph of him and the other subjects in the photo array. The procedures employed by Detective Carinha were discussed in detail at the suppression hearing.[77] Franklin also asks whether there were additional arrays or photographs viewed containing his photograph but for which there was no identification. The Government proffers that there were no other arrays and, therefore, this issue is moot. Finally, Franklin argues that his photograph was clearly from a prior arrest and that the "undercover officer certainly knew that fact"[78] but offers no support for this argument.

Franklin has failed to make a factual showing of impropriety or undue suggestiveness with regard to the photo array used in the pretrial identification. The mere use of a photo array is not inherently suggestive and use of the instant array cannot prevent admission of either the pre-trial identification or an in-court identification by the UC.[79] However, in an abundance of caution, Franklin will be permitted to renew his motion to suppress shortly before the UC testifies. The Court will then hold a brief evidentiary hearing at which defense counsel will be permitted to question the UC as to the manner in which the identification procedures were conducted to ensure that use of the instant photo array was not unnecessarily suggestive. For now, Franklin's

motion to suppress his pretrial identification based on the photo array is denied, with leave to renew as a motion in limine before trial.

### D. John Franklin's and Ebrima Jobarteh's Motions for a Bill of Particulars

#### 1. John Franklin

 Franklin and Jobarteh seek a bill of particulars. Specifically, Franklin requests a bill of particulars setting forth "each and every sale or assistance in the sale of crack-cocaine that the [G]overnment claims the defendant JOHN FRANKLIN committed," including the date and time of the sale, the location of the sale, and an identification of all participants (including unindicted coconspirators) in the sale.[80]

There is no danger here that Franklin will suffer from unfair surprise at trial. He has received ample information about the crimes charged in the Indictment. *First,* as detailed in the Criminal Complaint and Indictment, the Government has explained the time frame of the conspiracy, the location of the conspiracy, and a specific act by Franklin-the sale of crack cocaine to an undercover officer on April 4, 2009. The Complaint specifically provides:

On or about April 4, 2009, [an undercover officer ("UC–1")] purchased approximately six ziplock bags containing "crack" cocaine from JOHN FRANKLIN. Specifically, UC–1 knocked on the door to the Apartment and JASON

---

**76.** *See* John Franklin Affirmation and Accompanying Memorandum of Law ("Franklin Mem.") at 2–4.

**77.** *See* Tr. at 58–67.

**78.** *See* 12/2/09 Reply Affirmation of Alan M. Nelson, Franklin's counsel, ¶ 13 ("Clearly [Franklin's] photo was from a prior arrest. Moreover[,] the undercover officer certainly knew that fact. Therefore[,] the danger of a

suggestive identification procedure based upon a *totality of the circumstances has* ... been prima facie demonstrated. . . . ").

**79.** *See Simmons,* 390 U.S. at 384, 88 S.Ct. 967; *U.S. v. Richardson,* 837 F.Supp. 570, 573 (S.D.N.Y.1993).

**80.** Franklin Mem. at 8.

MORGAN, a/k/a "Sina," answered the door. Then FRANKLIN asked UC–1 what UC–1 wanted, and UC–1 stated "six," meaning six ziplock bags of "crack" cocaine. UC–1 then gave FRANKLIN $60, and FRANKLIN gave UC–1 six ziplock bags containing a white rocklike substance.[81]

*Second,* the Government produced several hundred pages of discovery to Franklin, including detailed information about each undercover purchase of crack cocaine from the defendants. The undercover "buy" reports specifically state the date and location of each sale, and generally describe who was present. The only information arguably missing from the reports is a list of all of the defendants and unindicted co-conspirators who were present for each sale. But Franklin is not entitled to this detailed evidentiary material.[82] He is only entitled to know if the Government is alleging his personal involvement in a particular sale.

Despite the detailed allegations and the extensive discovery provided by the Government, Franklin seeks further information—all or most of which he already has.

His request for a bill of particulars is a transparent attempt to obtain additional, detailed discovery about the charged crime, and he is not entitled to such information.

Taken together, the materials already provided give Franklin ample opportunity to prepare his defense and leave no possibility of unfair surprise. Accordingly, Franklin's request for a bill of particulars is denied.

### 2. Ebrima Jobarteh

Jobarteh's request for a bill of particulars is considerably more detailed, as he asks for a bill of particulars with regard to eight separate categories of information.[83] For the reasons stated above, with regard to Franklin's request for a bill of particular, Jobarteh's request for a bill of particulars is similarly denied.

### E. Franklin's and Jobarteh's Motions for Various Other Items of Discovery

Franklin has also moved for additional discovery. Jobarteh has joined in Franklin's requests.[84] At the outset, this Court notes that the Government has already

---

**81.** Sealed Complaint ¶ 14(a).

**82.** *See Torres,* 901 F.2d at 233–34; *United States v. Sindone,* No. 01 CR 517, 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002) ("The stakes in a criminal case are high, and temptations of perjury, subornation and intimidation are ever present. Accordingly, the government is not required to turn over information that will permit a defendant to preview the government's case and tempt him to tailor proof to explain it away, or see to it that the government's proof is not presented."); *United States v. Bin Laden,* 92 F.Supp.2d 225, 242 (S.D.N.Y.2000) ("[R]equests, such as those made by the Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have 'almost uniformly been denied.' ") (quoting *United States v. Wilson,* 565 F.Supp. 1416, 1438 (S.D.N.Y.1983));

*United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y.1987) ("Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial.").

**83.** See Memorandum of Law in Support of Defendant Ebrima Jobarteh's Omnibus Pre–Trial Motion ("Jobarteh Mem.") at 8–9.

**84.** *See* Defendant Ebrima Jobarteh's Omnibus Pre–Trial Motion at ¶ III (requesting "[a]n Order directing the United States Attorney to furnish the discovery material requested in Part IV of the motion of Defendant John Franklin, dated October 3, 2009 (the "Franklin Motion'), and directing that Part IV–DF of the Franklin Motion be made applicable to Mr. Jobarteh"). Hereinafter, these two defendants will be referred to as "Discovery Defendants."

produced discovery to each defendant, including Discovery Defendants, pursuant to Federal Rule of Criminal Procedure 16. And, of course, the Government recognizes that its obligation to provide discovery is of a continuing nature, and the Government will, if it obtains additional evidence, supplement its production of material required by Rule 16(a)(1)(A) and any other provision of Rule 16, for that matter. In any event, because Discovery Defendants' discovery requests are either moot, premature, or not required by any statute or the Federal Rules of Criminal Procedure, they are hereby denied.

Discovery Defendants request that the Government disclose: (1) information on any witness who failed to identify defendant Franklin upon viewing the photo array; (2) "statements of any individuals which are inconsistent with or contrary to prior statements made by that individuals," regardless of whether the Government intends to call the individual as a witness at trial; (3) "statements of any individuals interviewed by law enforcement personnel connected with this prosecution, which are inconsistent with or contrary to statements of other individuals interviewed," regardless of whether the Government intends to call the individual as a witness at trial; (4) "statements of any individual interviewed by law enforcement personnel connected with this prosecution, which are inconsistent with or contrary to the government's theory of prosecution," regardless of whether the Government intends to call the individual as a witness at trial; and (5) "any inconsistent statement of any confidential informant or co-operator and any other evidence that might raise questions concerning the reliability or integrity of any confidential informant or co-operator." [85]

### 1. *Brady* Material

The Government has asserted that, to date, it has disclosed everything of which it is aware that is arguably *Brady* material. Moreover, the Government is mindful of its continuing obligation to disclose *Brady* material, and will produce any additional such material as soon as the Government learns of its existence.

### 2. *Giglio* and Jencks Act Materials for Government Witnesses

 There is no basis for the early disclosure of *Giglio* and Jencks Act materials requested by Discovery Defendants for Government witnesses (such as prior inconsistent statements of witnesses). As a threshold matter, the Government has not yet identified which witnesses it intends to call at trial. That determination will depend upon a number of considerations, including which defendants proceed to trial. In any event, the law is clear that the Government is under no obligation under the Jencks Act to produce prior statements of its witnesses until after each has testified on direct examination.

However, in order to avoid any adjournment or delay in the trial which might conceivably occur if *Giglio* material were not produced until after the Government's witnesses have testified, the Government will adhere to its customary practice of producing impeachment material at least two days before a witness will testify, or, if additional time is reasonably required to review such material, sufficiently in advance of the witness's testimony so as to avoid any delay at trial. This practice will allow defense counsel adequate time to prepare for the cross-examination of Government witnesses.

### 3. *Giglio* and Jencks Act Materials for Uncalled Witnesses

 The Government submits that Discovery Defendants' request for *Giglio*

---

**85.** John Franklin's Notice of Motion ¶ IV(a)- (e).

and Jencks Act materials for individuals that the Government does not intend to call as witnesses and whose credibility is not in issue should be denied. I agree. The Government is not required to provide any such information for non-testifying witnesses.

## IV. CONCLUSION

For the reasons stated above, all outstanding pre-trial defense motions are hereby denied, except for the motions to suppress the pre-trial identifications of Jason Morgan and David Morgan. However, the motion to suppress the identification of Franklin may be renewed as a motion *in limine*, shortly before trial, if this case proceeds to trial as to this defendant. The Clerk of the Court is directed to close these motions (Documents # 33, 37, 52, and 59). A status conference for all defendants is scheduled for February 19, 2010, at 4:30 p.m. in Courtroom 15C at 500 Pearl Street.

SO ORDERED: